## I. TOWNSEND BURDEN, Appellant, *v.* JAMES A. BURDEN et al., Respondents.

1. CORPORATIONS — CONSTRUCTION OF PROMOTERS' AGREEMENT AS TO HOLDINGS OF STOCK. J. B. and T. B., on transforming a partnership, composed of themselves only, into a manufacturing corporation with 2,000 shares of stock, executed, together with one A., an agreement which provided that J. B. should "take, own and hold" 1,000 shares, T. B. 998 shares, and A. 2 shares; J. B. agreed that if he should "at any time sell or assign 998 shares of his stock," he would transfer his other 2 shares to T. B.; and it was agreed that all the profits of the corporation should be divided equally between J. B. and T. B. It was agreed by A. that he would not receive the dividends on his two shares, but in place thereof a salary from the corporation; that in case of a sale of his stock, it should be sold share and share alike to J. B. and T. B., and that if either refused to purchase, the other should be entitled to half or the whole at his election. *Held,* that the agreement did not mean that 998 of J. B.'s shares, if sold at all by him, must be sold at one time, and did not import a restraint upon him from disposing of that portion of his stock by sale to third parties in amounts less than 998 shares, and, hence, did not prohibit transfers by him of single shares to qualify new trustees.

2. CERTIFICATE OF CHANGE IN NUMBER OF TRUSTEES. It is not essential to the validity of a certificate, under chapter 316 of the Laws of 1878, for the purpose of changing the number of trustees of a manufacturing corporation, that it should be made at a formal regular meeting of the trustees.

3. BY-LAW OBJECTED TO BY MINORITY STOCKHOLDER. A minority stockholder of a manufacturing corporation is not entitled to have a new by-law annulled and wholly set aside, on the claim that it is unreasonable and beyond the corporate powers, when it appears that the by-law deals to a large extent with the ordinary business of the corporation and is not void as a whole, and it does not appear that the trustees have threatened any specific act in subversion of the charter to the injury of stockholders.

4. HOLDING OF REAL ESTATE BY CORPORATION. A holding of real estate by a corporation, which, even if *ultra vires,* has not been attacked by the sovereign or by a creditor, cannot be questioned by a stockholder who has assented to the acquisition.

5. HOLDING OF STOCKS OF OTHER CORPORATIONS BY MANUFACTURING CORPORATION. In an action by a stockholder of a manufacturing corporation against the trustees, attacking the holding, by the corporation, of the stocks of other companies, and seeking the distribution thereof, the burden is on the plaintiff to show that the stocks were illegally held; and in the absence of such proof, it will be assumed that the action of the corporation is legal.

6. CONTRACT BETWEEN CORPORATIONS HAVING COMMON DIRECTORS. A stockholder cannot enjoin the execution of a contract made by his corporation with another corporation, within the corporate powers and free from fraud, on the sole ground that the promoters of the contract were directors in both corporations.

7. ACCUMULATION OF SURPLUS. A stockholder cannot enjoin the accumulation of a surplus by the trustees of his corporation, so long as the trustees are acting honestly and within their discretionary powers.

*Burden* v. *Burden,* 8 App. Div. 160, affirmed.

(Argued April 19, 1899; decided June 6, 1899.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the third judicial department, entered July 22, 1896, affirming a judgment of the Special Term dismissing the complaint, except as to the provisions for an injunction forbidding the defendants individually and as members of the board of trustees of the Burden Iron Company from prosecuting what is called, in the complaint, "fancy farming," at the expense of the company.

This was an action in equity, the nature of which and the facts relating thereto, so far as material, are stated in the opinion.

*E. Countryman* and *Henry A. King* for appellant. The court erred in declining to hold that the transfers of shares from the defendant Burden to the defendants William and Richard Irvin, Jr., and subsequently to the defendant Gable, were ineffectual as against the plaintiff; or that the plaintiff is the owner of one-half of the property and effects of the corporation; or that the defendant Arts is not the real or equitable owner of his two shares of stock or of the property or effects of the corporation; or that by-law No. 11 was not in violation of the promoters' agreement; or in refusing to restrain the defendants from acting under such by-law, or excluding the plaintiff from participating as trustee in the affairs of the company, to all of which exceptions were duly taken. (L. 1848, ch. 40, § 1; *Anderson's Case,* L. R. [7 Ch. Div.] 75; *Denham & Co.'s Case,* L. R. [25 Ch. Div.] 752; *Edwards Case,* 7 Sim. 337; 1 Myl. & Cr. 650; *Stanley*

*Case,* 3 Myl. & Cr. 773; 2 J. & H. 746; *Williams Case,* 10 Hare, 547; *Spiller Case,* L. R. [7 Ch. Div.] 368; *Chater* v. *S. R. Co.,* 19 Cal. 220; *Whitney* v. *Wyman,* 101 U. S. 392; *Wood* v. *Whelan,* 93 Ill. 154; *Reichwold Case,* 106 Ill. 439.) The attempted increase of trustees was invalid. (L. 1878, ch. 316, § 2; *Glover Case,* 5 W., H. & G. 66; *Cammeyer Case,* 2 Sandf. Ch. 187; *C. E. Bank* v. *C. C. Co.,* 1 Bosw. 436; *Craver Case,* 45 Penn. St. 386; *Story* v. *Furman,* 25 N. Y. 214; 4 R. S. [8th ed.] 2926, 2927, § 27; L. 1874, ch. 321; *Smith* v. *People,* 47 N. Y. 330; *People ex rel.* v. *Davenport,* 91 N. Y. 575; *Matter of Livingston,* 121 N. Y. 94; *People ex rel.* v. *Butler,* 147 N. Y. 164; *Ogden* v. *Murray,* 39 N. Y. 207.) By-law No. 11 was in violation of the promoters' agreement. (Angell & Ames on Corp. § 347; 1 Thomp. on Corp. §§ 1010, 1016, 1020; 1 Cook on Corp. [4th ed.] 16, § 4a; *Taylor* v. *Griswold,* 14 N. J. L. 223; *Philips* v. *Wickham,* 1 Paige, 590; *Matter of L. I. R. R. Co.,* 19 Wend. 37; *Pickering* v. *Stevenson,* L. R. [14 Eq.] 322; *Bergman Case,* 29 Minn. 278; 3 Thomp. on Corp. § 3979; *Allerton Case,* 18 Wall. 233; *Gill* v. *Balis,* 72 Mo. 424; *Curtis* v. *McCollough,* 3 Nev. 203; *Comm.* v. *Gill,* 3 Whart. 228; *Temple* v. *Dodge,* 89 Tex. 68; *Kent* v. *Q. M. Co.,* 78 N. Y. 159; *Hoblyn* v. *King,* 2 Brown's Par. Cas. 329.) The trial court properly decided that the business of farming and gardening could not be continued, and granted an injunction. (*Tollbridge Co.* v. *Osborne,* 35 Conn. 7; *People* v. *U. Ins. Co.,* 15 Johns. 358; *N. Y. F. Ins. Co.* v. *Ely,* 2 Cow. 678; *Crocker* v. *Whitney,* 71 N. Y. 161; *People's Bank* v. *St. Anthony's Church,* 109 N. Y. 512; *Landers* v. *F. S. M. E. Church,* 97 N. Y. 119; 1 Taylor on Ev. § 80; 1 Greenl. on Ev. § 211; *Doe* v. *Ford,* 3 Ad. & El. 649; *Hill* v. *M. W. W. Co.,* 2 B. & A. 544; *Doe* v. *Howells,* 2 B. & A. 744; *Bowes* v. *Foster,* 2 H. & N. 779; *Fairtitle* v. *Gilbert,* 2 D. & E. 169.) The court erred in declining to continue the injunction granted during the pendency of the action "restraining the defendants from changing the face of the Woodside grounds, and from making excavations or cutting down trees thereon,

37

or building the new or proposed roadway over said grounds, or from expending the funds of the company for such purposes," and in refusing to find, as a legal proposition, that the " defendants have wrongfully allowed and permitted the defendant to change the face of the Woodside grounds, and to make excavations and cut down trees," etc., to which the plaintiff duly excepted. (*U. S.* v. *Appleton,* 1 Sumn. 500; Taylor on Landl. & Ten. 72, §§ 178, 179, 465, 478; *Browning* v. *Dalesme,* 3 Sandf. 14; *Newton* v. *Newton,* 17 Pick. 201; *Keny* v. *Goodwin,* 16 Mass. 1; *Wright Case,* 40 Cal. 20; *Cunliffe Case,* 2 Russ. & Mylne Ch. 481; *Robinson* v. *Smith,* 3 Paige, 232; *Ogden* v. *Murray,* 39 N. Y. 204; *Barr* v. *N. Y., L. E. & W. R. R. Co.,* 96 N. Y. 444; *Bowden Case,* 14 Abb. [N. C.] 357.) The defendants, Burden and Arts, had no right to use Hudson river ore in the Burden Iron Works, not, at least, until or unless they can demonstrate that it was beneficial to the Burden Company. In any other event, it was a violation of their duty as trustees of the Burden Company, and a breach of trust. (*Munson* v. *S. G. & C. R. R. Co.,* 103 N. Y. 58; *A. R. Co.* v. *Blakie,* L. R. [2 Eq.] 1281; *Wardell Case,* 103 U. S. 651; *Thomas Case,* 109 U. S. 522; *W. I. Co.* v. *Extension Co.,* 129 U. S. 644; *People* v. *Building Co.,* 92 N. Y. 98; *Barr* v. *N. Y., L. E. & W. R. R. Co.,* 125 N. Y. 264; *Pearson Case,* 62 N. H. 537; *Yerkes Case,* 141 Ill. 320; *M. E. Ry. Co.* v. *M. Ry. Co.,* 11 Daly, 377.)

*Esek Cowen* for respondents. The so-called " promoters' agreement," or the contract preceding the incorporation, fixing the way in which the stock should be distributed and held, was properly construed by the trial judge, and contained no restriction upon the sale of the stock by either party. (*Mayor,* etc., v. *Conover,* 5 Abb. Pr. 171; *People ex rel.* v. *Draper,* 24 Barb. 265; *Hartt* v. *Harvey,* 32 Barb. 55; *People ex rel.* v. *Conklin,* 5 Hun, 452; *Magley* v. *Atton,* 4 Phillips, 790; *Mickles* v. *R. C. Bank,* 11 Paige, 118; *Ciancimino* v. *Man,* 48 N. Y. S. R. 697; *De Peyster* v. *Michael,* 6 N. Y. 496;

*More* v. *Bank of Commerce,* 52 Mo. 377; *Matter of Klaus,*
67 Wis. 401.)   The trial court was right in holding upon the
facts of this case that the court had no power to direct the
withdrawal from the capital of the company, of the real estate
and stocks of other corporations which were transferred by
the partners to the corporation at the time of its formation.
(L. 1883, ch. 361; *Express Co.* v. *Railroad Co.,* 99 U. S.
199; *Yates* v. *Van De Bogert,* 56 N. Y. 530; *C. Bank* v.
*Risley,* 19 N. Y. 381; *F. L. & T. Co.* v. *Clowe,* 3 N. Y.
474; *F. L. & T. Co.* v. *Curtis,* 7 N. Y. 466; L. 1883, ch. 361;
Angell & Ames on Corp. § 312; *Fooks* v. *L. R. R. Co.,* 19
Eng. L. & Eq. 7; *Scott* v. *De Peyster,* 1 Edw. Ch. 513; *Hotel*
v. *Wade,* 97 U. S. 613; *Kent* v. *Q. M. Co.,* 78 N. Y. 159;
*Parsons* v. *Hayes,* 14 Abb. [N. C.] 419; *Parish* v. *Wheeler,*
22 N. Y. 494.)   The trial court rightly held that by-law No.
11 of the Burden Iron Company is legal and authorized by
the statute under which the corporation was organized, and
that, whether legal or not, the plaintiff was entitled to no relief
in equity. (*Hoyt* v. *Thompson,* 19 N. Y. 207; *Palmer* v.
*Yates,* 3 Sandf. 137; *Kent* v. *Q. M. Co.,* 78 N. Y. 178;
*Presbyterian Church* v. *Mayor, etc.,* 5 Cow. 538; Morawetz
on Corp. §§ 535, 536.)   The trial court properly declined to
find that the defendant trustees had wrongfully, or in viola-
tion of their duty, excluded the plaintiff from the control and
management of the company, and also properly refused to
grant any equitable relief upon that ground. (*Fulton Bank*
v. *N. Y. & S. C. Co.,* 4 Paige, 127; *Marine Bank* v. *Cle-
ments,* 31 N. Y. 33; *Adriance* v. *Roome,* 52 Barb. 399.)   The
trial judge properly denied the request of the plaintiff that
the defendants be forbidden to intrust the property and funds
of the company to the defendant John L. Arts, as manager
thereof, unless he shall furnish and deliver to said company
proper security.   And the said judge also properly denied the
request of the plaintiff to compel a division of the profits on
hand, or an annual division of the profits to be earned in the
future. (*Karnes* v. *R. & G. V. R. R. Co.,* 4 Abb. [N. C.]
107; *Williams* v. *W. U. T. Co.,* 93 N. Y. 192.)   The trial

court properly denied the request of the plaintiff for judg-
ment enjoining the defendants from expending any of the
funds of the Burden Iron Company in purchasing, or from
using in the blast furnaces of the said Burden Iron Company,
any of the iron ore from the mines of the Hudson River Ore
and Iron Company. (*M. E. Ry. Co.* v. *M. Ry. Co.*, 14
Abb. [N. C.] 78; *Gardner* v. *Butler*, 30 N. J. Eq. 703;
*Wallace* v. *L. I. R. R. Co.*, 12 Hun, 460; *McNaughton* v.
*Osgood*, 41 Hun, 109; Morawetz on Corp. § 243; *Dudley* v.
*K. H. School*, 9 Bush, 578; *Leslie* v. *Lorillard*, 110 N. Y.
532; *Van Cott* v. *Van Brunt*, 82 N. Y. 535; *Gamble* v. *Q.
C. W. Co.*, 123 N. Y. 91.)

*Roswell A. Parmenter* for respondents.    By-law No. 11
was valid.   (*Hoyt* v. *Thompson*, 19 N. Y. 207; *Beveridge* v.
*N. Y. E. R. R. Co.*, 112 N. Y. 1; *Marsh* v. *Falker*, 40 N.
Y. 562; *Stitt* v. *Little*, 63 N. Y. 427.)   The exceptions taken
by the plaintiff to the rulings by the trial judge on the ques-
tion touching the purchases by the Burden Iron Company
from the Hudson River Ore and Iron Company of iron ore to
help supply the blast furnaces of the former company are
untenable.   (*McNaughton* v. *Osgood*, 41 Hun, 109; L. 1866,
ch. 838, §§ 3, 4.)   The discretion exercised by the promoters
of the corporation and trustees thereof, as to the necessity of
holding stocks in other companies for the uses and purposes
of the Burden Iron Company, may not be reviewed by the
plaintiff in this action.   (*Schenck* v. *Andrews*, 57 N. Y. 133;
*Greaves* v. *Gouge*, 69 N. Y. 154; *Huntington* v. *Attrill*, 118
N. Y. 365; L. 1876, ch. 358; L. 1883, ch. 361; *Matter of
McGraw*, 111 N. Y. 110; *W. A. Co.* v. *Barlow*, 63 N. Y.
69.)   The power and duty to declare dividends in manufac-
turing corporations are conferred upon the board of trustees,
and the plaintiff, as a stockholder, has no legal title to any of
the property or profits of the corporation until such dividend
has been declared by the company, through its board of trus-
tees.   The board has discretionary power over the time when
such dividend shall be declared and as to the amount thereof,

and also what surplus of profits shall remain undivided to strengthen the financial standing of the company. (*Hyatt* v. *Allen*, 56 N. Y. 553 ; *Matter of Kernochan*, 104 N. Y. 629 ; Field on Corp. §§ 104, 105.)

BARTLETT, J.    It is conceded by the learned counsel for the appellant that as the facts have been finally determined in the lower courts, the only questions discussed on this appeal are those of law, arising upon the facts found at the trial.    It is, therefore, necessary to state, as briefly as possible, the important facts contained in three volumes of the printed record and three hundred and thirty-eight separate findings, before approaching the discussion of legal questions submitted in voluminous briefs.

Henry Burden, the father of three sons, William, now deceased ; Townsend, the present plaintiff, and James, the present defendant, in 1864 formed a copartnership in the iron business at the city of Troy, under the name of H. Burden & Sons.

William died in 1867, and Henry, the father, in 1871, and thereafter Townsend and James continued the firm until July 1, 1881.

On the 30th of June, 1881, the plaintiff, the defendant and one John L. Arts, organized a corporation under the Manufacturing Act of 1848, for the purpose of conducting the manufacture of iron and steel and the various articles of commerce made from iron and steel and the mining of iron ore, it being the same business previously conducted by the firm.

On the same day, and as part of the transaction which resulted in the organization of the corporation, these three parties executed a contract, referred to throughout this litigation as the promoters' agreement, which reads as follows :

"For value received it is agreed between the undersigned, who are the sole associates of the Burden Iron Company, that the stock of said company shall be taken, owned and held as follows, to wit :

"James A. Burden shall take, own and hold one thousand

shares; I. Townsend Burden shall take, own and hold nine hundred and ninety-eight shares, and John L. Arts shall take, own and hold two shares. The said James A. Burden agrees to and with the said I. Townsend Burden that if he shall, at any time sell or assign nine hundred and ninety-eight shares of his said stock, then and in such case he will, without any consideration for the same, transfer the other two shares of his said stock to the said I. Townsend Burden, his executors, administrators or assigns. All the profits arising from the business of the said corporation shall be divided equally between the said James A. Burden and I. Townsend Burden. The said Arts agrees for himself, his executors and administrators, that in case of a sale of any or all of his said stock, that said James A. Burden and I. Townsend Burden shall be entitled to the same, severally, share and share alike, at and for its par value; and in case either of them shall refuse in writing to make such purchase, then the other shall be entitled to his half, or the whole thereof, as he may elect.

"It is further agreed that said Arts shall not receive any dividends, income or profit from the said corporation, or its business, but that, in place thereof, he shall have and receive a salary to be fixed by the said board of trustees of said corporation.

"Dated *June* 30, 1881.

                    "I. TOWNSEND BURDEN.
                    "JAS. A. BURDEN.
                    "JOHN L. ARTS."

It may be stated, generally, that the organization of this corporation was due to certain unfortunate and irreconcilable differences between the two brothers.

The defendant James A. Burden was a practical iron master, while the plaintiff was familiar with that part of the business not requiring the same degree of practical knowledge and skill possessed by James.

The views of the brothers were divergent upon almost every question of business policy, and the trial court finds that the controversy was so fixed in its character and so irreconcilable

that the parties had ceased to hold any personal conversation with each other and discussed their grievances in written communications only.

This state of affairs had existed for some time, and several months before the corporation was formed James had determined to have the partnership dissolved and the property divided, retaining counsel to institute proceedings. The trial court found that during the entire period the firm of H. Burden & Sons existed the same business was conducted and the partners successively owned the real estate and personal property which was subsequently conveyed by the partners and their wives to the corporation, and was of the value of two millions of dollars.

Prior to the incorporation of the business and the execution of the promoters' agreement, James rejected the proposition of the plaintiff to withdraw from the corporation any of the partnership property; also the proposition to make himself and Townsend equal holders of the capital stock in the proposed company. James insisted that the distribution of the capital stock should be such that by no combination could he be ousted from the board of trustees of the corporation, and to this Townsend finally assented.

The promoters' agreement was then executed and the company organized with a capital stock of $2,000,000.00 divided into two thousand shares, of which one thousand were allotted to James, nine hundred and ninety-eight to Townsend, and the remaining two to Arts, who was made general manager, having grown up in the business and acquired a knowledge thereof.

James' position at the time the company was about to be organized was that he would wind up the partnership, break up a great and profitable business and distribute its property unless a corporation was formed in which he should hold a controlling interest.

This position assumed by James was distinctly understood by Townsend, and in the end he yielded his assent.

This fact is of paramount importance as it furnishes an

answer to many of the questions in this case, taken in connection with the situation of affairs existing at the time this action was commenced.

The corporation began business July 1st, 1881, and this suit was instituted December 27th, 1884, three years and a half after the plan was adopted which, it was hoped, would heal all differences. This plan, however, failed, notwithstanding the fact that the business was managed with great skill and was very profitable. The trial court has found that for seven and a half years after the formation of the company its business yielded an average net profit of fifteen per cent annually, on its capital stock of $2,000,000.00, and that dividends had been paid, aggregating $1,520,000.00, and one-half thereof paid to the plaintiff.

The manner in which the old partnership and its corporation successor conducted business, the nature of the property owned by the firm and transferred to the company, and the amount of its surplus must now be stated.

The original partners constituting the firm of H. Burden & Sons put into it all the property they possessed, even if not strictly necessary to the conduct of the business.

At the time the firm ceased doing business and the corporation was formed, its entire property was valued at not less than $2,000,000.00.

It consisted, in addition to the business plant, of a farm, located near the works of the company in the vicinity of Troy, containing about one hundred and seventy-five acres, forty acres of which were known as " Woodside," being under high cultivation and on which were located two fine mansions, one occupied by Townsend and the other by James.

For years this property was conducted in an expensive manner, and all bills were paid by the firm and subsequently by the corporation.

In the language of the complaint, " fancy farming " was carried on. Townsend managed the fruit and floral departments, building expensive conservatories, and James indulged in Jersey cattle and other phases of high-grade farming.

The profits were divided equally between the brothers. On the motion for a receiver in this case, and on complaint of the plaintiff, this mode of farming was abandoned; and, when final judgment was entered, no opposition was made to a perpetual injunction forbidding the prosecution of so-called "fancy farming."

The firm also owned and transferred to the corporation stock of the Port Henry Iron Ore Company, Lake Champlain and Moriah Railway Company, New Jersey Steamboat Company, and several other corporations, aggregating in value some $600,000.00, although standing on the books of the Burden Iron Company at $192,975.00.

The trial court found that, in addition to paying out $1,520,000 in dividends, the company, at the time of the trial, had half a million of dollars to its credit in solvent banks; that its surplus, with the stocks valued as entered on the books, added to the cash, was $757,637.31, and, estimating the stocks at their actual value, the surplus would stand at $1,164,662.31.

The farm is valued at $26,355, and the two mansions at not exceeding $123,000.00 in the aggregate.

In December, 1884, while the corporation was very prosperous and paying large dividends, as already pointed out, the plaintiff began this suit. The amended complaint is lengthy, and prays for a variety of relief.

The learned counsel for the plaintiff states in his reply brief that when this action was commenced the plaintiff was led to believe, and did believe, that the corporate capital had been "trenched upon" and reduced below the legal limit, but that after the plaintiff obtained the privilege of examining the books and papers, he ascertained the actual state of affairs, and that thereupon notice was given in behalf of the plaintiff, in open court, at an early stage of the trial, that he abandoned that portion of his complaint; that thereafter he gave no proofs to sustain it.

This removes from the case to a great extent the charges of waste and misapplication of the funds of the corporation,

which were a prominent feature of the original attack upon the defendants, and narrows, somewhat, the field of inquiry.

It may also be observed that the trial judge after finding specifically as to all of the allegations of the complaint, found generally " that by reason of the prudent business management and judicious control of the business of said company at all times since its formation, the said plaintiff has not sustained any pecuniary loss or damage, but, on the contrary, as appears from the testimony, he has received and is still continuing to receive, by way of dividends, very large returns, remuneration and profits from the capital he has invested in the Burden Iron Company."

We are, therefore, to start out in the consideration of the questions of law with the fact settled that the defendants have managed the company prudently and judiciously so that the plaintiff, ever since the company was formed, has received large returns upon his capital.  We shall confine ourselves to the legal questions discussed in the briefs.

Two of the propositions advanced by the counsel for the plaintiff may be stated and considered together.  Briefly they are as follows : That the promoters' agreement, which is an essential part of the charter of incorporation, was improperly construed by the courts below as to its restrictions upon selling the stock of the company imposed on the original incorporators, and that if it had been given due force and effect the increase of trustees from three to five would not have been made, as no stock could have been transferred to the new trustees by James in order to qualify them to act.   There are other objections to the change in the number of trustees of a statutory character which will be considered later.

The appellant's counsel has argued at length that additional provisions may be agreed upon by parties forming a corporation other than those contained in the certificate of incorporation.

We shall assume, for the purposes of this discussion, that the promoters' agreement may be regarded as an essential part of the charter.   We shall also assume that the contract is to be

interpreted by the fair import of its language without the aid of the declarations of parties or their attorneys made at the time of its execution.

Confining ourselves within the four corners of the instrument, we are satisfied that it is not subject to the construction sought to be given it by the plaintiff, which would prevent James making any disposition of his stock except the single sale of nine hundred and ninety-eight shares, he at the same time transferring to Townsend his remaining two shares so that the latter would own half the stock of the company.

The particular language of the agreement now under consideration is as follows, viz.: "James A. Burden shall take, own and hold one thousand shares; I. Townsend Burden shall take, own and hold nine hundred and ninety-eight shares, and John L. Arts shall take, own and hold two shares. The said James A. Burden agrees to and with the said I. Townsend Burden that if he shall at any time sell or assign nine hundred and ninety-eight shares of his said stock, then and in such case he will, without any consideration for the same, transfer the other two shares of his said stock to the said I. Townsend Burden, his executors, administrators or assigns. All of the profits arising from the said corporation shall be divided equally between the said James A. and I. Townsend Burden."

Arts then agrees he will not receive the dividends on his two shares, but in place thereof a salary from the corporation.

Arts agrees in case of a sale of any or all of his stock, that same shall be sold share and share alike to Townsend and James, and if either refuses to make the purchase the other shall be entitled to half or the whole at his election. The meaning of this contract seems clear enough without giving to it a construction, not only strained, but that might violate the principle of public policy which encourages the free transfer of property.

In seeking for the meaning of this agreement we are to bear in mind that it is a settled fact in this case that it was understood when the company was formed, James was to have a majority of the stock and as a consequence the control

of the company; he held one thousand shares against Townsend's nine hundred and ninety-eight. So long as this situation lasted, James was in absolute control. It was a very natural and just provision that if James saw fit to dispose of nine hundred and ninety-eight shares of his stock he should sell the other two shares to Townsend so that the latter would own half the stock of the company if James saw fit to retire. This did not fairly mean under the language of the agreement that the nine hundred and ninety-eight shares must be sold, if sold at all by James, at one time, but the fair construction is that when James by one sale, or many, had disposed in the aggregate of nine hundred and ninety-eight shares, then he must transfer the remaining two shares to Townsend, so that the latter would own as much stock as all the rest outstanding in the hands of third parties if he had meanwhile retained his original holding of nine hundred and ninety-eight shares.

The provision for the equal division of profits between James and Townsend was evidently limited to the duration of Arts' agreement not to receive any dividends on his two shares of stock, but in place thereof he was to have a salary. It would follow if at any time Arts left the employ of the company he would be entitled to dividends on his two shares of stock which had been paid to Townsend while he was in the employ of the company.

The promoters' agreement is brief and might well have contained more elaborate provisions, but, taking it as it stands, there is no reasonable difficulty in ascertaining its meaning. The language of the agreement, in apportioning the stock, is that each corporator shall "take, own and hold" so many shares. The appellant seeks to give to the word "hold" peculiar and unusual meaning, so as to create a restraint upon James from disposing of his stock by way of sale to third parties in an amount less than nine hundred and ninety-eight shares.

The word "hold," as here used, is found in a very common form of expression employed to vest an interest in real estate or personal property, and is not to be given any different meaning than that to be inferred from the context.

While we do not wish to be understood as expressing an opinion as to whether the agreement would contravene any principle of public policy if open to appellant's construction, that question not being before us, yet we are satisfied that if the parties thereto had desired to restrain the transfer of stock for a long and indefinite period of time, very different language would have been employed.

The courts below have properly construed the promoters' agreement, and it follows that the transfer by James of one share each to qualify the two new trustees was not prohibited thereby.

We will add, before leaving this branch of the case, that as we have construed the promoters' agreement upon its face, without the aid of "opinions of experts," to use the language of appellant's brief, the appellant was not prejudiced if any expert evidence is to be found in the record, which is exceedingly doubtful.

It remains to consider whether the statutory proceedings were properly observed in order to increase the number of trustees of the Burden Iron Company from three to five in the year 1884.

The material portion of the statute under which this change in the number of trustees was made provides : ." The existing trustees of any such corporation, or a majority of them, shall make and sign a certificate, declaring how many trustees the corporation shall have in the future management of its business  *  *  *, which certificate shall be acknowledged  *  *  *  and shall be filed in the office of the clerk of the county where the original certificate of incorporation was filed, and a duplicate  *  *  *  filed in the office of the secretary of state." (Laws 1878, ch. 316, § 2, amending an act which amended the Manufacturing Act of 1848.)

The appellant's criticism is that this certificate could only be made at a regular meeting of the board of trustees upon due notice to all the members.

A motion was made at Special Term for an injunction prohibiting the new board from exercising its powers on the

ground of this alleged irregularity, and Mr. Justice PECKHAM held that the certificate was regular. The trial judge and the Appellate Division have since held to the same effect.

The letter of the statute was clearly observed in making this certificate and no formal meeting of the board of trustees was required. It is unnecessary to pass upon the question whether plaintiff's remedy was by quo warranto if he wished to remove the new trustees, as we hold their appointment to be regular.

The appellant's next point relates to what is known as by-law No. II. The history of this by-law is as follows:

In the spring of 1884, while Townsend was in Europe, James was taken severely ill and for a time incapacitated to continue in charge of the business. He went to Europe for a few months to benefit his health, leaving Arts in charge. Townsend, in the emergency, returned to this country and he naturally found it difficult to agree with Arts, the general manager of the company.

In the autumn of 1884 James returned and then it was that steps were taken to secure him the control of the company in case of emergency. On November 20, 1884, by-law No. II was passed by the board of trustees, Townsend not being present, although he had written notice of the meeting, but it did not state the nature of the business to be considered. On Feb. 27, 1885, this by-law was slightly amended, modifying, to some extent, the powers of Arts, the general manager, thereunder. On Nov. 25, 1884, the increase of trustees from three to five took place. This by-law need not be quoted at length here.

It opens as follows: "The general manager shall have the management of the works and of the business of the company in all its branches and departments, manufacturing, commercial and financial."

It then proceeds to enumerate the various powers in detail conferred upon the general manager, covering, it would seem, the ordinary and usual business of the company. The closing sentence of the by-law is as follows: "And in addition to the

foregoing the general manager shall have the general and exclusive charge and management of the business of the company in all its details not herein specified, and he shall be the executive officer of the board of trustees, but being at all times subject to the control of the board of trustees of the company."

It will thus be seen that while this by-law may confer some unusual powers upon the general manager, such as having sole charge of the affairs of the company in case of strikes, the payment of money for the temporary relief of employees in event of accidents, and the fixing of terms and prices on the sale of the products of the business, nevertheless he is at all times subject to the control of the board of trustees.

The learned counsel for the plaintiff, in an elaborate and able argument, attacks this by-law as unreasonable, in excess of corporate power as exercised by the trustees and void.

This by-law, in any event, is not void as a whole, dealing as it does, to a very great extent, with the ordinary business of the company, and so long as the trustees act within their charter powers, the minority stockholder and trustee is bound by the by-laws enacted.

If the trustees threaten acts in subversion of the charter and to the great and irreparable injury of the stockholders, such specific action will be restrained on a proper appeal to a court of equity.

The relief prayed for in this action, that the by-law be annulled and set aside, is too broad and general and not within the power of the court to grant on this record.

The appellant in his next point challenges the power of the corporation to retain possession of and deal with the farm, the "Woodside" grounds and the stocks of other corporations.

We have already adverted to the fact that for many years prior to the organization of the corporation the firm held these properties and that James stated at the time the company was formed that, unless all the assets of the partnership were transferred to the corporation, he would not consent to become a corporator, but would insist on dissolving the firm

and winding up the business. It was found by the trial judge that for many years prior to 1871 one of the mansions was the family homestead of the father of Townsend and James, and the other was the home of William, their brother, since deceased.

This plan of managing the firm and family property was peculiar and had existed for years, and it is admitted and proved that Townsend consented to and acquiesced in its continuance after the corporation was formed and joined in the conveyances to the corporation.

The plaintiff insists that, notwithstanding this consent and continued acquiescence on his part, he is at liberty to repudiate the settlement of differences that resulted in the organization of the corporation and compel the company by the decree of a court of equity to surrender the property in question to a receiver to be sold and divided between himself and James.

The plaintiff's path is beset with legal difficulties. At present the title to this property is vested in the corporation.

It is held that where a corporation is incompetent by its charter to take title to real estate a conveyance to it is not void, but only voidable, and the sovereign alone can object. It is valid until assailed in a direct proceeding for that purpose. (*National Bank* v. *Matthews,* 98 U. S. 621, 628, and cases cited.)

It is equally well settled that the act of a corporation that is *ultra vires* cannot be questioned by a stockholder who has assented to it. (*Kent* v. *Quicksilver Mining Co.,* 78 N. Y. 159; *Hotel Company* v. *Wade,* 97 U. S. 13.)

It is true that in these cases the rights of third parties were also considered, but the principle holds good between the stockholders. If in the case before us neither the sovereign nor the creditor appears upon the scene, surely the plaintiff has no occasion to complain of a situation that he assisted in creating.

The plaintiff holds half of this two millions of dollars of stock, less two shares, and asks that property of the value of more than $700,000, upon which the stock was in part issued,

shall be taken out of the assets and distributed. It is also to be observed that the trial court has found that the farm is necessary to the use of the company within the meaning of the statute; that the company can obtain therefrom timber and ties for its seven miles of railroad operated in connection with its works; hay, oats and pasture for a large number of horses that it uses, and the control of a stream of water, whose source is on the farm, which supplies one of its mills. It is also found that the company receives rent for the farm and mansions.

As to the stocks of outside companies held by the corporation there are various statutory provisions that permit this holding under certain limitations.

The appellant urges that there is no evidence and no finding that the Burden Iron Company held these stocks lawfully. The burden of proof was on the plaintiff to show the stocks were illegally held, and in the absence of such proof the court will assume the action of the corporation is legal. (*Express Co.* v. *R. R. Co.*, 99 U. S. 199; *Yates* v. *Van De Bogert*, 56 N. Y. 530; *Chautauque Co. Bank* v. *Risley*, 19 N. Y. 381; *Farmers' Loan & T. Co.* v. *Clowe*, 3 N. Y. 474; *Farmers' Loan & T. Co.* v. *Curtis*, 7 N. Y. 466.)

It is also urged on behalf of appellant that this is a case for the application of the rule ignoring the corporate entity, and determining the equities between the real parties in interest. If the soundness of this position were conceded, it would not aid the plaintiff, in view of the findings of fact which are binding upon this court. We are of opinion that the point under consideration is not well taken.

The appellant makes a separate point to the effect that the court erred in declining to continue the injunction granted, during the pendency of the action, restraining the defendants from building a new roadway, etc., on "Woodside" grounds.

The views we have expressed in considering the power of the corporation to hold and deal with this property under the last point, render it unnecessary to further discuss the subject.

The appellant, in his next point, insists that it was error for

the trial judge to refuse an injunction enjoining the defendants from expending any of the funds of the Burden Iron Company in purchasing or using the ore from the mines of the Hudson River Ore and Iron Company.

The Hudson River Ore and Iron Company was organized in 1883; James A. Burden was at one time its president, and during the period involved in this suit held $391,400, and Arts held $22,000 of its capital stock.

Plaintiff was not a stockholder in this company, and objected to the Burden Iron Company purchasing and using the Hudson river ore, as it was called, in the trade.

The substance of plaintiff's charge is that James and Arts combined and conspired together, in violation of their duties as trustees, to the great damage of the Burden Iron Company, and to build up and sustain their own private interests in the Hudson River Ore and Iron Company, to induce the purchase, from time to time, of the Hudson river ore by the Burden Iron Company.

This issue was one of the most bitterly contested in the case; a very large amount of testimony was taken, and the trial court has found certain facts, on conflicting evidence, which are conclusive on this appeal.

The plaintiff claims that as the two companies had common directors, it was unlawful for them to deal with each other; also that the company was subjected to great loss in the use of the Hudson river ore, which was inferior in quality, and affected, in a marked degree, the finished products of the business.

The trial court found that James and Arts did not make these purchases of Hudson river ore to benefit themselves, or to build up and benefit the Hudson River Ore and Iron Company, nor were they made in bad faith or with any intent to defraud; that by the purchase of the Hudson river ore in the place of the same quantity of higher priced brown hematite ores a saving was effected from July 1st, 1883, to November 1st, 1889, of $97,394.88, and that during the same period there was a saving of $58,178.90 in manufacturing pig iron

instead of purchasing it, if there was excluded from the costs of manufacture the proportionate share of the general expenses of the company which was charged to the blast furnaces. The trial court also found as a conclusion of law that the purchase of the Hudson river ore at its fair market value, as disclosed by the evidence, was not a wrongful or illegal act on the part of the Burden Iron Company or its trustees.

The question of fraud, or bad faith, is thus removed from the case, and we are to consider whether plaintiff was entitled to the injunction prayed for by reason of the fact that James and Arts were directors in both companies.

It is undoubtedly a well-settled rule of law that executory contracts entered into by corporations having common directors are voidable at the instance of either corporation, and the court will not inquire into the question whether or not it is beneficial to the corporation seeking to avoid it.

This right is vested in the corporation and not in the individual stockholder.

A stockholder cannot enjoin the execution of a contract *intra vires* unless fraud is shown.

Morawetz on Corporations (§ 243) uses this language : " So long as the agents of a corporation act honestly within the powers conferred upon them by the charter, they cannot be controlled. The individual shareholders have no authority to dictate to the company's agents what policy they shall pursue, or to impair that discretion which was conferred upon them by the charter."

The rule is also laid down in *Leslie* v. *Lorillard* (110 N. Y. 532). Judge GRAY, speaking for the court, said : " In actions by stockholders, which assail the acts of their directors or trustees, courts will not interfere unless the powers have been illegally or unconscientiously executed, or unless it be made to appear that the acts were fraudulent or collusive and destructive of the rights of the stockholders. Mere errors of judgment are not sufficient as grounds for equity interference; for the powers of those intrusted with corporate management are largely discretionary."

The plaintiff was not entitled to the injunction prohibiting further dealings with the Hudson River Ore and Iron Company.

The plaintiff is doubtless quite right when he insists that he nas been ignored in the management of the Burden Iron Company, and has no control, save to vote his stock, over properties of great value in which his interest is nearly one-half, but he apparently fails to appreciate 'that his troubles are inherent to the situation.

The plaintiff is in the position of all minority stockholders, who cannot interfere with the management of the corporation so long as the trustees are acting honestly and within their discretionary powers.

The court below has found that the trustees in this case so acted.

The plaintiff complains that the surplus of the Burden Iron Company is unnecessarily large and should be distributed in part at least.

So long as the .rustees are acting honestly and within their discretionary powers in accumulating a surplus, the plaintiff must submit.

If it can be shown that trustees of a corporation are guilty of fraud and bad faith in accumulating a large surplus to the injury of the stockholders, a court of equity would doubtless interfere. .

The plaintiff insists that the surplus is now a million one hundred thousand dollars.

This amount is reached by adding to $500,000 in the banks, $600,000, the value of the stocks of outside companies held by the corporation.

It is apparent that these stocks are in no legal sense surplus to be divided among the stockholders, but capital whose income alone would go to swell the dividends of the Burden Iron Company.

The judgment appealed from should be affirmed, with costs.

All concur.

Judgment affirmed.