## FORD v. MAGEE.

No. 183, Docket 20491.

Circuit Court of Appeals, Second Circuit.

Feb. 28, 1947.

458

Emanuel Tacker and H. R. Korey, both of New York City, for appellant.

Julius M. Arnstein, and I. Jonas Specimer, both of New York City, for appellee.

Before L. HAND, AUGUSTUS N. HAND and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The respondent, Magee, appeals from an order in bankruptcy which directed him to turn back to the petitioner—a trustee in bankruptcy of the Harlem Garment Center, Inc.—$5000 alleged to be assets of the bankrupt. Upon the trustee's petition the referee ordered Magee to show cause why he should not turn over the money, Magee answered, the case came on for trial and considerable testimony was taken. The referee filed a decision in which he found the case fit for summary disposition, and ordered Magee to turn over the money. Magee then appealed to the district court, which affirmed the order; whereupon he appealed to this court. The only issue is whether the trustee made out a plain enough case to dispense with an action. The facts, as developed in the testimony and for the most part as found by the referee, were as follows. The Harlem Garment Center was a small corporation organized in May, 1945, under the laws of New York, doing business in that city. Magee was its treasurer, one, Golenbock, its president, and Keelan, its vice-president and secretary; and they were its directors. A man named Silverman was nominally only an employee, but his powers were very large, as will appear. Its capital was 100 shares of stock, which, when the directors met for the first time on July 17, 1945, they allocated as follows: forty-five shares to Golenbock, thirty-five to Keelan, ten to Magee and ten to William H. Leahy. Silverman was present at this meeting, and declared that he had paid for Golenbock's shares and for Leahy's also, for he was anxious to have Leahy in the company. By the 3rd of August, there were no funds in the treasury to meet the payroll, and at Silverman's request Magee gave the company his cheque for $5,128.42, whose proceeds he used for the purpose. Becoming restive over this outlay, he procured, through a man named Casey, a cheque from Leahy for $5000 to the order of "Graham Magee, Treasurer," which Magee endorsed and deposited in his own account. It is the proceeds of this cheque which are the subject of the proceeding. Leahy had enclosed the cheque in a letter addressed to the bankrupt, "Attention: Mr. Graham Magee," in which he said, "I am advised you are

familiar with stock arrangements to be covered by this cheque"; and it is too obvious to deserve discussion that Magee was fully aware that Leahy meant the proceeds to be used to take up the ten shares which had been allotted to him at the directors' meeting at which he had not been present. Magee's denials before the referee that he knew that the cheque was so intended, were patent, even childish, concoctions which the referee was right to disregard; and, if the result depended only upon his finding that Magee knew that he was appropriating corporate funds, we should unhesitatingly affirm the order. The difficulty is that this was not the only determinative issue; for, if the bankrupt gave Magee leave to use the cheque in payment of its debt to him, he was entitled to keep the money. That issue depends first, upon whether Silverman had authority on behalf of the bankrupt to permit Magee to appropriate the money; and second, whether he gave him permission to do so.

First as to Silverman's authority. While he was at the directors' meeting he declared, as has appeared, that he had paid more than one half of the whole capital. Perhaps he had not paid for Leahy's ten shares, and Leahy certainly could not have so understood; but at least when Silverman first appeared it was as one who was far from an ordinary employee. That would not, however, alone be enough to give him the authority here necessary; but there was more. Golenbock described Silverman's position in the company in these words: "Mr. Silverman was everything; he was the production manager, he was the general manager, he was the complete manager." It was Silverman's job to raise the money for the payroll. Again: "There was only one man in that company that had anything to say about the company's financial problems" and "that was Mr. Silverman." Magee also testified: "Silverman was the general manager of this thing, and he discussed the allocation of stock in the corporation, which had been organized before I ever heard of Harlem Garment Company, and in that he allocated stock in the way he thought it should be distributed." Next, as to whether Silverman gave Magee permission to pay the debt out of Leahy's cheque. After Magee had paid the payroll, and had talked to Casey, he talked to Silverman. This was Magee's testimony of that talk. "Q. * * * did you speak to Mr. Silverman and tell him you talked to Casey? A. Yes, I did.

"Q. Did you tell him what Casey said? A. Yes, I did.

"Q. Did you have a talk with Silverman about that? A. Yes.

"Q. Did he say anything about that Leahy check? A. He said 'You can credit it against your loan.'"

The power of a bankruptcy court to reduce to possession the assets of the bankrupt, in others' custody, is essential to the administration of estates, and that court should, of course, not allow itself to be fobbed off by transparent fabrications; but, as in the case of most other legal questions, the boundaries of the power are not fixed by sharp lines. Under its guise the court must not extend its jurisdiction to genuine controversies with third persons. So far as the boundaries can be defined in general terms, all that can be said has been said over and over again; the difficulties lie in the impalpable nature of the issue itself. In Cline v. Kaplan,[1] the Supreme Court said nothing new, but we may quote it as the last authoritative utterance: The bankruptcy court "has both the power and the duty to examine a claim adverse to the bankruptcy estate to the extent of ascertaining whether the claim is ingenuous and substantial. * * * Once it is established that the claim is not colorable nor frivolous, the claimant has the right to have the merits of his claim passed on in a plenary suit and not summarily." Applying this language to the case at bar, we cannot properly say that Magee's claim was only "colorable" in so far as it asserted that Silverman had an authority from the directors which made him in effect the factotum of the nascent company. Apparently, Silverman, Magee and perhaps Keelan originally supplied all the money that came into the treasury, for Golenbock seems to have been Silverman's dummy. Besides, Golenbock and Magee were two

---

[1] 323 U.S. 97, 99, 65 S.Ct. 155, 156, 89 L.Ed. 97.

out of three directors and Keelan, the third, may well have been complaisant. Finally, there was nothing to dispute Golenbock's testimony that "Silverman was everything"; and if so, he had authority to pay the company's debt to Magee out of any money in the treasury. Although it is, of course, true as a general matter that authority to act for a corporation vests in its board of directors, in New York as elsewhere the directors may delegate the management of its affairs to a committee, or even to an individual, in furtherance of the convenient dispatch of the business as a whole.[2] This doctrine is to be distinguished from that which invalidates any arrangement by which the shareholders agree that only those shall be elected directors who will consent to be dummies, or that their statutory powers shall be circumscribed.[3] If Keelan and Golenbock were willing to leave the business to Silverman, and if Silverman did tell Magee that he might use Leahy's subscription for his shares to pay the company's debt, the trustee has no claim to it; and in the absence of any contradiction by Silverman, whom apparently neither side dared call, it would be improper to assume that Golenbock's and Magee's testimony was false. It is true that Magee showed himself utterly untrustworthy about Leahy's subscription, and it is possible that upon a trial his credibility would be so much impaired that the judge or the jury would not believe anything he said; but we may not dispose of the issue in that way here; the maxim, "falsus in uno, falsus in omnibus," is well enough in its way, but it will not serve to support this petition.

The result is one more illustration of what, one would suppose, had been proved often enough already: i.e., that it is almost a mistake to seek a conclusion in situations of this sort by the short cut of a summary proceeding. Time and money are spent, the controversy remains undecided, the administration of the estate is delayed and further prosecution of the claim is chilled. In the case at bar there was no justification for taking the chance; the bankrupt was a New York corporation, Magee a citizen of Connecticut; the district court would have had jurisdiction under § 24 of the Bankruptcy Act, 11 U.S.C.A. § 47. The time which elapses between the filing of the complaint and final judgment in the Southern District of New York is about eighteen months for jury cases, and thirteen for those tried to a judge; the interval between the initiation of this proceeding and the order of the district court now on appeal was about ten months. Thus, not much time would have been gained, even if the proceeding had succeeded; and now that it has failed, all must be begun again, or the claim must be abandoned. We cannot too insistently urge upon trustees not to proceed in this way; we cannot too seriously impress upon referees the duty of discouraging in every way possible those trustees who do so proceed. An especially effective sanction would be to announce in advance, except in the plainest cases, that if the trustee should fail, neither he nor his attorney will be granted an allowance for their services in the summary proceeding. We shall treat this as warning in advance that in the future we shall feel free upon appeals to deny any such allowance, even though the referee may have granted one.

Order reversed; petition dismissed without prejudice to a plenary action.

[2] Hoyt v. Thompson's Executors, 19 N. Y. 207, 214–216; Sheridan Electric Co. v. Chatham National Bank, 127 N.Y. 517, 28 N.E. 467; Burden v. Burden, 159 N.Y. 287, 302, 303, 54 N.E. 17; Peck v. Sulphite P. & P. Co., 164 N.Y. 127, 58 N. E. 6.

[3] Manson v. Curtis, 223 N.Y. 313, 119 N.E. 559, Ann.Cas.1918E, 247; Fells v. Katz, 256 N.Y. 67, 175 N.E. 516; McQuade v. Stoneham, 263 N.Y. 323, 189 N.E. 234.