Milton E. SAHN, as Trustee in Bankruptcy of Murray Packing Co., Inc., Bankrupt, Petitioner-Appellant,

v.

Joseph PAGANO, Respondent-Appellee, and
Stanley Weinberg, Respondent.

No. 292, Docket 27380.

United States Court of Appeals Second Circuit.

Argued April 2, 1962.

Decided April 25, 1962.

Harold L. Lipton, New York City (Booth, Lipton & Lipton, Edgar H. Booth, New York City, of counsel), for petitioner-appellant.

Samuel D. Pressman, New York City (Vincent Velella, Saul I. Radin, New York City, of counsel), for respondent-appellee.

Before CLARK, HINCKS and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

Milton E. Sahn, trustee in bankruptcy of Murray Packing Co., Inc. (hereafter Murray or the bankrupt), appeals from an order of the District Court for the Southern District of New York, 200 F. Supp. 16 (1961), which reversed an order of Referee Herzog directing Joseph Pagano, president of Murray, to turn over to the trustee $745,000 admittedly received by Pagano from Murray within the month preceding the filing of the involuntary bankruptcy petition. This order was without prejudice to the plenary suit which the judge believed to be required. We reverse the order of the District Court and restore that of the Referee.

The summary turnover order is "a judicial innovation by which the court [of bankruptcy] seeks efficiently and expeditiously to accomplish ends prescribed by the statute." Maggio v. Zeitz, 333 U. S. 56, 61, 68 S.Ct. 401, 404, 92 L.Ed. 476 (1948). The rules governing this remedy were authoritatively stated in Mr. Justice Sanford's opinion in Harrison v. Chamberlin, 271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897 (1926): " * * * a court of bankruptcy is without jurisdiction to adjudicate in a summary proceeding a controversy in reference to property held adversely to the bankrupt estate, without the consent of the adverse claimant * * * * However, the court is not ousted of its jurisdiction by the mere assertion of an adverse claim; but, having the power in the first instance to determine whether it has jurisdiction to proceed, the court may enter upon a preliminary inquiry to determine whether the adverse claim is real and substantial or merely colorable. And if found to be merely colorable the court may then proceed to adjudicate the merits summarily * * *." An adverse claim is merely colorable if and only if "the preliminary inquiry shows that it is so unsubstantial and obviously insufficient, either in fact or law, as to be plainly without color of merit, and a mere pretense."

Mr. Justice Sanford's statement suffices to show that a clearly baseless claim of fact no more gives the needed color than an equally baseless claim of law. In re Meiselman, 105 F.2d 995, 998 (2 Cir. 1939), underlined that a mere assertion of fact is not enough; we said, referring to Harrison v. Chamberlin, supra, May v. Henderson, 268 U.S. 111, 45 S.Ct. 456, 69 L.Ed. 870 (1925), and other cases, "We do not interpret these decisions as requiring the holding that there is reasonable doubt from the claimant's own testimony alone, when it is disbelieved by the referee * * * A claimant cannot avoid a summary order by the very audacity of his claims of either fact or law. The referee must proceed to determine whether the adverse claim is 'plainly without color of merit and a mere pretense' on a proper weighing of the testimony considered in the light of the claimant's self-interest and a due consideration of existing law."

That is what the referee did here. He characterized the story unfolded before him on the petition for a turnover order, primarily in testimony of Stanley Weinberg, Secretary-Treasurer of the bankrupt, as "the most audacious raid on a treasury that I have ever encountered." In summary it was this:

Murray was a meat and poultry wholesaler in the Bronx. Pagano became associated with Murray in March, 1960, as a salesman. In December, 1960, he

bought a third of its stock and became its president; the directors were Gussie Weinberg, Terry Newman, and himself. Until Pagano took over, Murray's purchases had averaged around $100,000 per week, and it was meeting its bills in a normal fashion. After Pagano's election as president, purchases and sales started a speedy upward course, the new sales being primarily to customers brought in by Pagano.

Between March 20 and March 29, 1961, Stanley Weinberg, on Pagano's instructions, drew various checks to Pagano's order which ultimately totalled $745,000. The first two, $50,000 each, were drawn on March 20 on the Royal State Bank of New York. When Weinberg came over to cash the checks, the bank, not having that amount in cash, drew its own check for $12,000 to Pagano and two checks, for $38,000 and $50,000, to the order of The First National City Bank which that bank cashed; Pagano's counsel conceded that Pagano received the $100,000 represented by the three checks. The Royal State Bank having advised that it would not honor checks drawn against uncollected funds, Pagano directed the opening of a new account at the Commercial Bank of North America where one of his customers kept its own balance, so that the bankrupt could draw immediately on deposits of the customer's checks; the Commercial Bank of North America was given a certified copy of an authorizing resolution purportedly adopted at a directors' meeting, which, Weinberg testified, had never occurred. The remaining $645,000 was drawn in 14 checks on the new account; Pagano admitted the receipt of this money. On each of three days three separate checks were cashed; not knowing exactly what drawable funds were in the account, Weinberg gave Pagano several checks so that he could get whatever was available. Meanwhile more than $400,000 in checks drawn to trade creditors remained unissued.

At the outset Weinberg acted simply on Pagano's demand, without discussion with anyone. Quite early in the game, however, he called his father, Joseph Weinberg, and Micky Newman, husbands of the two ladies who were listed as stockholders and directors along with Pagano. Joseph and Micky "got very excited" but ended up telling Stanley to let Pagano "have what he needs and by the week-end he will have it back to us." [1] Stanley Weinberg "knew whatever he [Pagano] wanted I had to give it to him"—a knowledge which Pagano reinforced by "banging on the desk" and admonishing " 'look, I am the boss. You just do what I tell you, and that's all there is to it.' "

Allegedly Pagano executed ninety-day notes for the amounts received, although circumstances created legitimate doubt whether the notes were in fact delivered prior to the bankruptcy. By April 4, 1961, when Murray executed an assignment for the benefit of creditors, accounts payable exceeded $1,300,000 and cash in the two banks was down to $3,000. Weinberg knew of no legitimate business purpose for the payments to Pagano and made no investigation of Pagano's ability to repay; Pagano told Weinberg "he was in trouble. He had done something over the weekend, or the previous week; he had lost some money and he needed it." When asked, at the hearing held on June 9, 1961, what he had done with the $745,000 concededly received from the bankrupt, Pagano refused to answer, as he had with respect to these and other questions when examined under § 21–a on May 15, 1961, on the ground that an answer might tend to incriminate him.

On this record the Referee held that the claim of a loan was "frivolous, baseless and fictitious and is put forward in bad faith" and that, in the absence of any evidence that Pagano no longer had the money, the "inference from yesterday's possession," recognized in Maggio v. Zeitz, supra, 333 U.S. at 66, 68 S.Ct. at 406, warranted a finding that Pagano still held the bankrupt's property. Accordingly, he directed Pagano to turn over $745,000 within five days from serv-

---

1. Neither Joseph Weinberg nor Newman was called as a witness.

ice of an order, which he signed July 24, 1961.

The District Judge reversed, stating, 200 F.Supp. at 18, that "It is not for him [the referee], in a turn-over proceeding, to decide the merits of really controverted issues," with which we agree, and that "Pagano's defense, however improbable it may seem, is no more frivolous than that of the plaintiff [sic] in Ford v. Magee," 160 F.2d 457 (2 Cir.), cert. denied, 332 U.S. 759, 92 L.Ed. 345 (1947), with which we do not. Very likely the general strictures against resort to turnover proceedings in the concluding portion of that opinion,[2] 160 F.2d at 460, misled the judge into thinking the case decided more than it had. There the defendant, Magee, admittedly had a *bona fide* claim against the bankrupt; the issues were whether the general manager of the bankrupt had consented that Magee keep a certain check in payment of that claim and had authority to do so. Since there was nothing inherently improbable in Magee's testimony of consent by the general manager, whom neither side called, and much evidence that the directors had delegated wide authority to him, this Court concluded that Magee's claim could not be said to lack the needed color. However, another sentence in the opinion made it plain that mere assertions do not prevent a finding of lack of color; it said that Magee's denials that he knew the check was intended for the corporation "were patent, even childish, concoctions which the referee was right to disregard; and, if the result depended only upon his finding that Magee knew that he was appropriating corporate funds, we should unhesitatingly affirm," 160 F.2d at 459.

Here the result did depend only on the referee's finding that Pagano "knew that he was misappropriating corporate funds," and the referee was warranted in regarding the loan explanation as "patent, even childish, concoctions." Weinberg's uncontradicted testimony fairly shrieked of theft; it would be su-

pererogation to dot the i's and cross the t's. Pagano offered nothing in opposition save the notes, whose term was itself inconsistent with Weinberg's testimony as to short-term accommodation and whose contemporaneous delivery was dubious. If proof of such delivery would have given the needed color, the judge would have been right in insisting on a full-scale proceeding; but it would not. A theft is no less a theft if the thief obligingly leaves a note in the cash drawer; like a higher tribunal, a referee may also recognize that "there comes a point where this Court should not be ignorant as judges of what we know as men," Mr. Justice Frankfurter in Watts v. State of Indiana, 338 U.S. 49, 52, 691 S.Ct. 1347–1348, 93 L.Ed. 1801 (1949). Pagano was free to avail himself of the privilege against self-incrimination but—whether or not an inference could be drawn from his doing so in a proceeding of this sort, see 8 Wigmore, Evidence (McNaughton rev. 1961), § 2272, at p. 439 & fn. 14—his claim that testimony would incriminate him cannot be transformed into a plausible assertion of innocence in the acquisition of the monies or an adequate denial of continued possession of them, Dittmar v. Michelson, 281 F. 116, 117 (3 Cir.), cert. denied, 260 U.S. 738, 43 S.Ct. 95, 67 L.Ed. 489 (1922). Pagano's story was quite as pallid as that held to lack sufficient "color" in In re Weinreb, 146 F. 243 (2 Cir.), cert. denied, 203 U.S. 588, 27 S.Ct. 776, 51 L.Ed. 329 (1906); it fits Judge Augustus N. Hand's phrase, "standardized forms of falsehood so often reiterated as to be neither credible nor interesting," In re Abesbaum, 70 F.2d 628 (2 Cir. 1934). Accepting that "The Referee and the Court in passing on the issue under * * * a turnover motion should * * * require clear evidence of the justice of such an order before it is made," Oriel v. Russell, 278 U.S. 358, 363, 49 S.Ct. 173, 73 L.Ed. 419 (1929), we think this test was met.

The order of the District Court is reversed and that of the Referee is affirmed.

---

2. These are severely criticized, on very substantial grounds, in 2 Collier, Bankruptcy (Moore and Oglebay ed. 1961), ¶23.06, at pp. 484–485 fn.