## DITTMAR v. MICHELSON.

(Circuit Court of Appeals, Third Circuit. May 22, 1922.)

No. 2827.

1. **Bankruptcy** ⬅︎136(2)—**Evidence held to support order requiring bankrupt to pay over money to trustee.**

Evidence showing that, five months before bankruptcy, bankrupt had several thousand dollars on deposit in a bank, where he had denied having an account, that the greater part had been withdrawn by checks payable to "cash," and bankrupt refused to state what had been done with the money, *held* to sustain an order by the referee requiring him to pay over the amount to his trustee.

2. **Bankruptcy** ⬅︎136(2)—**Procedure to compel surrender of property.**

On a charge that bankrupt withholds assets from his trustee, the ·question, to be ·determined primarily by the referee, is whether or not he had such assets at the time of bankruptcy, and, if so found he should be ordered to turn them over, leaving him to obey the order or to assume the burden of proving his present inability.

Appeal from the District Court of the United States for the District of New Jersey; Charles F. Lynch, Judge.

In the matter of Harry Michelson, bankrupt. On petition of Charles F. Dittmar, trustee, to revise an order of the District Court. Reversed.

McDermott, Enright & Carpenter, of Jersey City, N. J. (James D. Carpenter, of Jersey City, N. J., of counsel), for trustee.

Bilder & Bilder, of Newark, N. J. (David H. Bilder, of Newark, N. J., of counsel), for bankrupt.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. In this case, the referee in bankruptcy made two orders directing the bankrupt to pay over to the trustee $26,279.14. The bankrupt then filed a petition to have these orders set aside. On hearing, the court below granted the petition and entered an order reversing the turn-over orders entered by the referee. Thereupon the trustee took this petition to review this order of the District Court.

[1] An examination of the record shows the petition in bankruptcy was filed March 23, 1921. On demand made of the bankrupt by the trustee for all books and papers, he turned over books showing accounts in the First National Bank of Belmar and the First National at Spring Lake, and stated they were the only bank accounts he had. It was, however, discovered, August 8th following, that he also had an account in the Long Branch Banking Company, which on October 29, 1920, showed on deposit $26,279.14. Against this balance the bankrupt drew to order of cash nine checks, dated between November 4, 1920, and December 4, 1920, aggregating $20,480.67, and only one check for a small amount bore evidence of going through the hands of a third party. These checks had all been returned by the Trust Company to the bankrupt on June 22, 1921, which was after he had been

⬅︎For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

examined by the referee. When asked what he had done with the cash received on these checks, his answer was:

"By advice of counsel, I must refuse to answer, on the ground that it might incriminate me."

When inquired of as to the whereabouts of the bank book, he said he did not know. He also said he had no books or papers showing how much of the money represented by the three bank accounts, aggregating deposits of $121,519.80 made in 1920, was his, and what he did with the money. He stated he lost a great deal of money, but, when asked how, his answer was:

"I refuse to answer, on advice of counsel, on account it might incriminate me."

There was also testimony tending to show that between August 4, 1920, and October 20, 1920, the bankrupt had in his possession large quantities of wines and whiskies, and that the only assets he turned over to the trustee were a balance of $11 in the Belmar and $65.81 in the Spring Lake Bank.

Having the witness before him, and being enabled to judge of his conduct and attitude, which the referee in his report describes as contemptuous and willful, and that he was convinced the bankrupt was "deliberately attempting to evade his responsibility as a bankrupt in this court," he made the turn-over orders, the reversal of which is here complained of.

The possession of these large sums of money and property was within so recent a period before bankruptcy as would enable an honest trader to tell what had become of them. The absence of papers or accounts to evidence such large transactions was suspicious. While, of course, a witness may properly decline to incriminate himself, yet the fact that crime may make it more difficult and possibly hazardous to tell what became of assets, does not destroy the presumption of the continued possession of assets, whose disappearance is not accounted for. Having examined these proofs, we find no error in the referee making those preliminary orders of turn-over, and we see no legal ground for vacating them.

[2] Indeed, in making these preliminary orders, the referee was following the procedure carefully outlined by the late Judge McPherson, where he said (In re Epstein [D. C.] 206 Fed. 568):

"When the charge is made that assets have apparently not been accounted for, the referee hears and decides the dispute in the first instance. The point of time to which the inquiry is directed is the date of bankruptcy, and the precise question is whether the bankrupt was then in possession or control of money or of goods that apparently should have come into the hands of the trustee. Being fundamental, this question needs to be examined first of all, but it neither involves the bankrupt's present ability to turn over, nor raises the question whether he should be punished for contempt—except, of course, as the complexity of human affairs may compel an occasional approach to these allied subjects. The two questions last referred to, therefore, do not need consideration at the first stage of the investigation. If the assets that presumably should have been in the bankrupt's possession or control at the time of bankruptcy have not been accounted for, the referee may, and probably will, draw the natural inference, and direct the bankrupt to pay the money or deliver the goods as the case may be. If this order becomes final, either by failure to

have it reviewed or by affirmance in the District Court, a definite step has been taken; the proper tribunal has settled beyond future controversy that the assets described were in the bankrupt's possession or control at the time of bankruptcy."

Holding, then, as we do, that no error was made by the referee in making his turn-over orders, the proceeding is at a point where Judge McPherson says—

"a definite step has been taken; the proper tribunal has settled beyond future controversy that the assets described were in the bankrupt's possession or control at the time of bankruptcy."

While our present decision is, of course, limited to that preliminary step, and the question of the bankrupt's obeying or disobeying of such order and his punishment for contempt is not now before us, we deem it timely to refer, as to further proceedings, to what Judge McPherson outlined therein, viz.:

"Then comes the next question: Are they still there? Or what has become of them? This is evidently a distinct subject, which should not be confused with the other, but should be separately treated. It will need no attention, unless the bankrupt should fail to comply with the order to hand over; but failure to comply makes him presumptively liable to punishment for contempt. But only presumptively; he may have a complete answer to any attempt to punish, and in any event he cannot be punished until he has been heard. In such a hearing the inquiry is directed to the bankrupt's present ability to pay the money or deliver the goods, and unquestionably he makes a sufficient answer if he shows that he is physically unable to obey the order. If it be true that he does not now possess or control the assets, he may still be liable to the criminal law; but, except for willful disobedience of the court's command, he cannot be confined by civil process. The evidence produced must therefore satisfy the judge that the bankrupt is really unable to obey, and is not merely defying the order. This presents a mere question of evidence, and, if the bankrupt fails to prove that he cannot comply, he is simply in the ordinary position of a suitor that has not offered enough evidence to prove a fact, and is obliged to take the consequences of such failure. In the case in hand, the consequence is, that, as the order to pay or deliver stands without sufficient reply, it remains what it has been from the first—an order presumed to be right, and therefore an order that ought to be enforced. In the pending case, or in any other, the court may believe the bankrupt's assertion that he is not now in possession or control of the money or the goods and in that event the civil inquiry is at an end; but it is also true that the assertion may not be believed, and the bankrupt may therefore be subjected to the usual pressure that follows willful disobedience of a lawful command, namely, the inconvenience of being restrained of his liberty. No doubt this may be unpleasant; it is intended to be unpleasant, but I see no reason why the proceedings should be condemned, as if it interfered with the liberty of the citizen without sufficient reason or excuse. I have known a brief confinement to produce the money promptly, thus justifying the court's incredulity, and I have also known it to fail. Where it has failed, and where a reasonable interval of time has supplied the previous defect in the evidence, and has made sufficiently certain what was doubtful before, namely, the bankrupt's inability to obey the order, he has always been released, and I need hardly say that he would always have the right to be released as soon as the fact becomes clear that he cannot obey. Actual or virtual imprisonment for debt has ceased, but imprisonment to compel obedience to a lawful judicial order (if it appear that obedience is being willfully refused) has not yet ceased, and ought not to cease, unless it should be thought expedient to destroy all respect for the courts by stripping them of power to enforce their lawful decrees."

The orders to turn over being proper, the assets being presumptively in the bankrupt's possession, it will now be for him, in the subsequent proceeding, to show how and when they passed out of his possession. If the fear of incriminating himself prevents him from disclosing what he has done with such assets, that is an unfortunate situation, which the bankrupt has brought on himself; but it nevertheless leaves the case without any explanation by him of what he is now called upon to explain, namely, what he has done with the assets.

The order of the court below is reversed, the referee's order of turnover reinstated, and the cause remanded for further procedure.