DANISH v. SOFRANSKI et al. *
In re SOFRANSKI & BODNER, Inc.
No. 146.

Circuit Court of Appeals, Second Circuit.

Dec. 13, 1937.

*Writ of certiorari denied 58 S.Ct. 610, 82 L.Ed. —.

Henry E. Coleman, of New York City, for appellants.

Herman G. Robbins, of Brooklyn, N. Y., for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

The respondents, Sofranski and Bodner, appeal from an order directing each to pay the sum of $2,532.80 to the bankrupt's trustee on the ground that he has it in his possession and that it belongs to the bankrupt. They were respectively the president and the secretary-treasurer of the bankrupt, and they and their wives owned all its stock; it was adjudicated a voluntary bankrupt on May 2, 1935, and on November 13th the trustee initiated a summary proceeding before the referee to compel them to surrender funds of the bankrupt which they were alleged to be withholding. They appeared specially, and protested that they were not subject to summary jurisdiction, but the referee overruled their objection and heard the case on the merits. He first reported that they had in their possession $3,282.80 which he directed them to turn over, but on appeal to the district court, the cause was referred back, and upon a new hearing he reduced the amount to the sum just mentioned. The judge affirmed this order and the respondents appealed. The facts are as follows. The respondents had been millinery salesmen in the employ of others, earning, as Sofranski swore, about $90 a week. Their employer went out of business; and in 1930 they organized the bankrupt under the name of Sofranski & Bodner, Inc.; they were engaged in jobbing women's hats. During the year 1932 their average withdrawals were $56 a week and during 1933, $46; for the first nine months of 1934, they were $55. In that year, and apparently earlier as well, their custom was to withdraw $50 a week regularly, and at rare intervals, to borrow additional amounts, but the total of these withdrawals was no more than they might use in their daily living. They paid the bankrupt's bills for the most part, as they went along, and at bankruptcy they owed only three debts, a tax of $25, a judgment of $766.12 for rent up to December 31, 1934, and another judgment of a little more than $3,000 in favor of one Katz, for goods sold. They had had a trade dispute with Katz and sued him for $10,000; Katz countered in April 1934, with an action which was pending until April 1935, when he got judgment and the bankrupt's action (then in the form of a counterclaim) was dismissed.

The business had been poor in the autumn of 1934 and the respondents began to withdraw much larger sums than ever before. In October each took out $300, which alone would not have been very excessive, but on the 15th each withdrew $1,500 more, of which however, he restored $1,000 by the beginning of November; we may take the October withdrawals therefore at $800. In November each withdrew $1,257.80, and in December, $500. Thus the average weekly withdrawals for the last thirteen weeks of the year had increased from about $55 to nearly $200. It was a fair, indeed an inevitable, inference, coupled with their other conduct at the time, that the respondents were looting the company preparatory to winding it up. It had had some fixtures and the like; these they bought on December 6th for $250; substantially its only stock of goods consisted of an assortment of hats for the spring trade of 1934; these they bought on January 21st for $400. These sales may have been at too low a figure, but the trustee does not now press the point. In December in conjunction with others, they organized a new company, and all business of the bankrupt ended at the latest with the sale of the hats; yet they each kept on drawing $50 a week until March 15th. If, as Sofranski said, this was to keep in touch with the trade, it could not benefit the bankrupt.

The referee adopted the simple calculation of adding up all that they had withdrawn from January 1, 1934 to March 15, 1935, and crediting this amount with $50 a week as salary. He thus reached a deficit of $2,532.80 which he concluded on July 15, 1937—the date of his second report—that the respondents were withholding. We shall assume that, if the only issue were whether they had abstracted that much from

the bankrupt's creditors at a time when they knew that by no pretence they could be entitled to it, the evidence is conclusive enough to overcome their adverse claim. Over a period of three years they had shown what they supposed their services to be worth, and the sudden increase in their withdrawals, coupled with the abandonment of the business and their entry into a new one, may perhaps leave no room for reasonable doubt. Moreover, while the amount properly creditable to them is necessarily somewhat elastic, it may be permissible to say that it could not have been more than $55 a week. From October 1st, 1934 to January 21st, 1935, that would establish a credit of about $900, and the deficiency unaccounted for would therefore be $3,132.50 less $900, or $2,232.50.

However, the trustee was obliged to prove not only that the respondents had wrongfully abstracted this money, but how much of it they had in their hands when the referee's order passed, at least his first order of March 2d, 1937. In re Schlesinger, 102 F. 117 (C.C.A.2); Sinsheimer v. Simonson, 107 F. 898, 907 (C.C.A.6); In re Holden, 203 F. 229, 233 (C.C.A.6); In re Redbord, 3 F.2d 793 (C.C.A.2). Most of the money was taken in the last three months of 1934; the rest, in the first ten weeks of 1935; the respondents made only $40 a week from the new company. There is certainly a fair doubt whether any of the money which they took remained unspent two years later; and if any did, it is impossible even to guess how much it was; the chances are that it was all gone, but it would be the merest fancy to fix an amount. The courts have met the issue of the respondent's ability to surrender in different ways, as different situations arose.

Thus in the case of chattels which have no value, like books of account, it is enough to show that he has secreted them. United States v. Moore, 294 F. 852 (C.C.A.2); In re Marcus Millinery Co., 37 F.2d 94 (C.C.A.2); In re M. & M. Mfg. Co., 71 F.2d 140 (C.C.A.2); In re Arctic Leather Garment Co., 89 F.2d 871 (C.C.A.2). The chance that he has destroyed them is deemed too remote to impose upon the trustee the duty of disproving it in anticipation.

Again—and this is by far the most common situation—the respondent may steadfastly deny that he has ever received any of the property at all. Sometimes he does this upon the proceeding to punish him for contempt. That is necessarily an unsuccessful excuse, because it disputes the finding in the summary order, which since Oriel v. Russell, 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419, is an estoppel. It is uniformly held that in this situation he stands charged and must explain how he disposed of it. In re Stavrahn, 174 F. 330, 20 Ann.Cas. 888 (C.C.A.2); In re Graning, 229 F. 370, Ann.Cas.1917B, 1094 (C.C.A.2); In re Siegler, 31 F.2d 972 (C.C.A.2); Sarkes v. Wells, 37 F.2d 339 (C.C.A.6). At other times in the summary proceeding itself, the respondent either denies having ever received the property or refuses to give any explanation; and then too the trustee need not prove his ability to comply; the burden of explanation is the respondent's. In re Levy & Co., 142 F. 442 (C.C.A.2); In re Weinreb, 146 F. 243 (C.C.A.2); In re Chavkin, 249 F. 342 (C.C.A.2); Dittmar v. Michelson, 281 F. 116 (C.C.A.3); In re Magen Co., 10 F.2d 91 (C.C.A.2); In re Cohan, 41 F.2d 632 (C.C.A.3); In re Steinreich Associates, 83 F.2d 254 (C.C.A.2). The ground for this has never been stated, but a valid explanation is that, as the supposed excuse would contradict his denial, it may be assumed that he would not make it; and that his refusal to answer, when he so refuses, may be assumed to continue. Logically no doubt there is still a hiatus, but the respondent may be said to have removed the issue from the case.

But when the respondent acknowledges receiving the property, and it is of a kind that he would be likely to dissipate—money or saleable goods—there is no reason why the trustee should not prove how much remains within the respondent's control. In such cases the trustee must make out his case upon this issue just as he must upon the original taking. In re Schoenberg, 70 F.2d 321 (C.C.A.2); In re J. L. Marks & Co., 85 F.2d 392 (C.C.A.7). We cannot see that Cooper v. Dasher, 290 U.S. 106, 54 S.Ct. 6, 78 L.Ed. 203, touches the matter at all. It is of course possible that the amount withdrawn may be so large, and the interval between the withdrawal and the order so short, that it can be said with certainty that a minimum must be left and what it is, but the trustee must in some way establish the point. In the case at bar we have already said enough to show that no inference could be made; the issue stands unproven and the petition should have been dismissed.

Order reversed; petition dismissed; no costs or disbursements.