**In re PINSKY–LAPIN & CO., Inc.**

**MALES v. PINSKY et al.**

**No. 368.**

Circuit Court of Appeals, Second Circuit.

Aug. 1, 1938.

Abraham H. Sarasohn, of New York City, for appellants.

Kaufman & Weitzner, of New York City (Eugene M. Parter, of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The order appealed from directs the appellant Herman Pinsky, the secretary and treasurer of Pinsky-Lapin & Co., which was adjudicated a bankrupt on February 27, 1937, on an involuntary petition filed on February 11, 1937, to turn over to its trustee in bankruptcy moneys and merchandise or the proceeds thereof, amounting in the aggregate to $6,648.05. It also directs the

appellant Vineland Farmers Corporation to turn over $321.30 in cash. The trustee instituted this proceeding on September 28, 1937, and obtained the "turnover" order on November 30, 1937. That order may be summarized as follows:

So far as it relates to Pinsky it embraced: (a) $1,269 representing two items derived from the bankrupt, one of $720 on January 25, 1937, and the other of $549 on January 28 in the same year. It was claimed by Pinsky that they were paid to one William B. Stone for alleged purchases from him by the bankrupt. The referee found that in fact neither the purchases nor the payments were made but that Pinsky withdrew this money himself in fraud of the creditors of the bankrupt. (b) $1,258.30 representing cheese, or the proceeds thereof, obtained from the bankrupt under the guise of a sale of merchandise to Joseph Golembe, Pinsky's brother-in-law. The referee found the alleged transactions fictitious and only a means of diverting assets to Pinsky. (c) $3,346.27 representing merchandise derived from the bankrupt, or the proceeds thereof, found by the referee to have been similarly diverted by Pinsky under the guise of sales to himself for the ostensible purpose of conducting an egg, butter and cheese business in Harlem taken over from one Werba. He paid nothing for this merchandise. (d) $591.14 representing moneys withdrawn by Pinsky from the bankrupt. This amount consisted of three items, namely, $251.77 which he said he received in cash and turned over to his wife Mollie Pinsky in payment of loans by her to the bankrupt, $227 and $112.37 which he could not explain. (Minutes 238, 551-53). The referee found each item represented a fraudulent concealment and was not accounted for in any credible way. In spite of the wholly inconclusive testimony as to the $227 and $112.37 items we shall treat all three as representing sums received by Pinsky and claimed to have been held adversely as agent for his wife, because all parties seem to have argued the appeal on that assumption. (e) $183.34 representing six checks of the bankrupt signed by Pinsky as managing agent. The moneys were admittedly received by him and never repaid. The referee found that each of the items represented a fraudulent concealment.

Vineland Farmers Corporation was directed to turn over $321.30 which it received through a check of the bankrupt dated December 2, 1936. The referee found that it was transferred by the bankrupt without any consideration and with intent to defraud creditors.

Two problems confront us at the outset: (1) The respondents argue that the bankruptcy court was without power to entertain a summary proceeding to compel the restitution of property alleged to belong to the estate. (2) The trustee argues that no appeal will lie from the order in the proceeding without leave of this court.

The first point is met by the fact that the respondents raised no timely objection to the summary proceeding. They answered the trustee's petition and went to trial without contending that the referee lacked power and that only a plenary suit would lie. Such a submission to the jurisdiction was sufficient even though there was no formal consent. Page v. Arkansas Natural Gas Corp., 286 U.S. 269, 271, 52 S.Ct. 507, 508, 76 L.Ed. 1096, affirming 8 Cir., 53 F.2d 27, 35; In re Hopkins, 2 Cir., 229 F. 378, 380. Objection was first made after the referee had issued his "turnover" order and at the time when the proceeding was on review before the district judge. That was too late.

The second problem relates to the sufficiency of the appeal. It was taken only under Section 24a of the Bankruptcy Act, 11 U.S.C.A. § 47(a), by allowance of the District Court. An application to this court for leave to appeal was thereafter made by the respondents under Section 24b, 11 U.S. C.A. § 47(b), but denied. The trustee moved to dismiss the appeal taken under Section 24a as to all six amounts directed to be turned over, on the ground that only proceedings in bankruptcy were involved and leave of this court was necessary. We held in Re Byrd Coal Company, 2 Cir., 83 F.2d 190, that if an officer of a bankrupt makes no claim personally to property involved in a "turnover" proceeding but "merely asserts that he does not have it" (page 192), the matter is a proceeding in bankruptcy within Section 24b and may be heard only if an appeal has been duly allowed by the Circuit Court of Appeals. An allowance by this court was, therefore, necessary in respect to all items except (c) and (d), the $3,346.27 and $591.14 sought to be recovered from Pinsky, and $321.30 sought to be recovered from Vineland Farmers Corporation, all of which present controversies and are appealable as a matter of right under Section 24a. The motion to dismiss the appeal is granted as to (a), (b) and (e) because Pinsky makes no claim to these sums

himself. It is to be noted that no matter what form of appeal were allowed the order would have to stand as concerns (a) because that item has not been attacked by any assignment of error and appellants' counsel apparently does not contend that Pinsky is not accountable for the moneys represented thereby.

There remains for our consideration the question whether the items (c) amounting to $3,346.27 and (d) amounting to $591.14 were properly held recoverable from Pinsky and the item amounting to $321.30 was properly held recoverable from Vineland Farmers Corporation.

The first question as to these three items is whether they were in the possession or within the control of the respondents at the time of bankruptcy and the second is whether the items were in their possession or within their control at the time when the "turnover" order was made. In re Schoenberg, 2 Cir., 70 F.2d 321; In re H. Magen Co., 2 Cir., 10 F.2d 91, 96; In re Epstein, 206 F. 568, 569, D.C.Pa.

### Item of $3,346.27.

This item was found by the referee to be derived from a fraudulent appropriation by Pinsky under the guise of alleged purchases by him from the bankrupt of 400 cases of eggs, 100 packages and boxes of cheese and 100 packages, boxes and tubs of butter. Pinsky testified that on September 30, 1936, he started business in Harlem with one Werba who owed the bankrupt $300 or $400 and that the purpose of the venture was to enable Werba to liquidate that indebtedness. Pinsky contributed to the business $1,000 borrowed from the Austro-Hungarian Credit Union, and about $500 more from the Morris Plan, which he deposited in his personal account in the Manufacturers· Trust Company, and eggs, butter and cheese obtained from the bankrupt. It was proved by the latter's books that Pinsky obtained the merchandise between September 30, 1936, and February 2, 1937, to the value of $13,487. He made payments sufficient to leave an unpaid balance of $3,470.97 on February 2, 1937, when Pinsky-Lapin & Co. ceased doing business. The referee deducted from the last mentioned amount $124.70 for the estimated profit of the bankrupt included in the charge on its books for the eggs, butter and cheese, leaving Pinsky responsible for $3,346.27. Of the merchandise so purchased $4,780 was delivered in January and February 1937. Pinsky accounts for the disposi-

tion of the merchandise by alleged losses of $1,000 in October, 1936, $1,500 in November, 1936, and $500 in December, 1936. This could hardly be, for he had paid the bankrupt for all purchases prior to January 1, 1937, and at that time had left cash of about $700 in his bank and a stock of goods worth about $1,000. He admitted that the egg market was not down in January, 1937. The only expenses of the Harlem venture would seem to have been $8 per week for two stands, $8 per month for rent of a store, $25 per week paid to Werba as salary, $11 per week paid to a man named Raisin, and $40 to $50 per week taken as salary by himself. These expenses between January 1 and February 2 would aggregate about $500. It would seem to follow from the testimony that he had paid all current expenses as the business went on, so that even if he made no profit prior to February 2 he should have had on hand $3,346.27 plus ($1,000 plus $700 minus $500) or $4,546.27. He testified, however, that the merchandise then left was only about $600 or $700. It is to be observed that he does not claim to have had losses during the period prior to February 2 except in eggs bought from unidentified farmers whom Werba testified he did not purchase from at all. He also attempted to account for the disposal of the Harlem assets prior to February 2 (after paying running expenses of the business) by unverified statements that he made payments to relations and friends who were creditors. The referee did not believe him. The case is apparently the old and conventional one of the officer of a bankrupt corporation who secures for it enlarged deliveries in the last few weeks preceding bankruptcy, appropriates the proceeds personally and attempts to cover his tracks by false entries and alleged payments to unidentified creditors or those whom he does not produce as witnesses.

When Pinsky was asked what became of the $600 or $700 which he said was all that remained of the Harlem assets on February 2, 1937, he replied: "I had been going on since the first of April and gradually had to live on it and it just went away. I had to pay gradually to these credit unions." The testimony indicates that he has lived with and to some extent on his father-in-law since the bankruptcy and has been employed for some time in the egg business. From the foregoing the referee's finding that merchandise, or its proceeds, to the value of $3,346.27 was in the possession of Pinsky

when the adjudication was entered was justified.

### Item of $591.14.

It was sufficiently established that Pinsky received sums of money from the bankrupt, to wit, $251.77, $227, and $112.37 totalling the above item of $591.14. But he claims to have received these sums as repayment of a loan to the bankrupt by his wife Mollie Pinsky. These payments were made on October 6, 1936, December 30, 1936, and January 29, 1937, respectively. They are charged to Herman Pinsky in the cash disbursement books and in the general ledger and represented by or included in checks of the bankrupt. While the books of the bankrupt showed an old loan of $1,500 to the corporation by Mrs. Pinsky, she owed it $4,250 on her unpaid stock subscription, so that she was in fact not a creditor at all but a debtor.

Two of the checks representing the above items were taken within two months before adjudication and the third only about four months before—all in the course of large and continuous depredations by Pinsky. The referee found the Mollie Pinsky story incredible and no other attempt to explain these misappropriations was made. We think the referee's finding that Pinsky was in possession of the $591.14 on his own behalf at the time of adjudication was justified.

### Vineland Farmers Corporation Transaction Item of $321.30.

Vineland owed the Bronx Refrigerator Company $918 for storage of eggs on which the latter had a lien. Vineland claims that the bankrupt purchased these eggs at $1,239.30 by assuming the obligation of $918 to the Bronx Refrigerator Company and paying $321.30 to Vineland by check to the latter's order dated December 2, 1936, which was collected in due course. The books of the bankrupt show a purchase price of $1,239.30, but the books of Vineland only show a sale to the bankrupt at $918 and nowhere mention a payment of $321.30 to meet any further balance arising from the transaction. Moreover, Schatten, the president of Vineland, was requested to prepare a schedule showing all the merchandise sold by Vineland to the bankrupt from June, 1936, to February 2, 1937. This schedule was furnished and purported to show all payments made for such merchandise. It contains no payment of $321.30. Schatten was also requested to prepare a schedule of checks exchanged between Vineland and the bankrupt during the same period. The check for $321.30 does not appear on this schedule. Numerous false entries made to conceal the withdrawal of assets by Pinsky appear on the bankrupt's books. The referee was clearly justified in finding the $321.30 represented a fraudulent appropriation of assets of the bankrupt. There is no dispute as to its possession at the time of adjudication.

We finally come to the question whether the items were in the possession or within the control of the respondents at the time when the "turnover" order was made. We need not go into the evidence on this point with respect to the item charged to Vineland. That respondent did not suggest that it did not have possession of the money represented by the check for $321.30. It limited its defense on the merits to evidence that the check was given in payment of a balance due on a sale of merchandise and did not represent an appropriation of assets. We have decided against Vineland on that issue. Indeed, the assignment of error (No. 7) directed to this item does not question possession at the time either of the adjudication or when the "turnover" order was made, but seems to recognize its existence. Accordingly the order as to this item should be affirmed.

The items of $3,346.27 and $591.14 are more troublesome in view of Danish v. Sofranski, 2 Cir., 93 F.2d 424. That decision, however, is distinguishable on the facts. There two officers of a corporation were each held liable for the sum of $2,532.80 taken under the guise of excessive salaries, but held by the district court to be an appropriation of assets. The referee made a "turnover" order under date of March 2, 1937, and finally modified it on July 15, 1937, by reducing the sums originally found to those above stated. The abstractions began in 1934 and ended on March 15, 1935. Therefore, when the order of July 15, 1937, was entered, two and a half years had elapsed since the withdrawals of October, November and December, 1934, which formed the real basis for the "turnover" order, had occurred. It was not unreasonable to hold that under such circumstances "no inference could be made" that $2,532.80, taken long before, still remained in the possession of the taker. Inasmuch as the length of time between the taking and the "turnover" order was so great as to dispel any inference of control based on the withdrawals alone and no other evidence

appeared on the record which would sustain an inference of continued possession, the order directing a "turnover" was properly reversed.

In the present case, however, the misappropriations by Pinsky aggregated $6,648.05. More than two-thirds of this sum was taken in January, 1937, less than eleven months before the "turnover" order, and nearly all the rest within one year theretofore. Moreover, the property with which he was charged by the referee as of the date of bankruptcy was not shown to have been lost in any business and the contrary was found. The only attempt to explain any disappearance of property related to that put into the Harlem business. The referee found that his story about losses in that business and payments to persons wholly unspecified or not produced as witnesses, and his other attempts to account for the disposition of the property, were unbelievable. Pinsky testified that he was living with his father-in-law who contributed to the support of his family. He said that all the moneys he had got since the $600 or $700 that was left up in Harlem had come from his father-in-law "who gives me living expenses" (Minutes 156). He testified that he began working in the store of his brother-in-law Sam Golembe about April or May 1937, and that he candled eggs and went to the market every day to make purchases for the store. The foregoing evidence established that the money was not dissipated for living expenses. Indeed, Pinsky expressly disclaimed this except as to the $600 or $700 and the referee did not believe his explanation. We cannot say that the latter was not justified in finding that he retained possession or control of the various sums abstracted up to the time of the making of the "turnover" order. A contrary conclusion on our part would be giving too much weight to things we know nothing about and too little weight to an inference drawn by the referee as to continued possession of property.

In Danish v. Sofranski, 2 Cir., 93 F.2d 424, the distinction is made between a complete denial by a respondent that he has ever received property of a bankrupt and an acknowledgment that he has received the property, where in each instance he has failed to account for its disposal. It is said that in the former situation the trustee need not prove the ability of the respondent to comply with a "turnover" order but that in the latter he must. It seems to us that such distinction cannot determine whether a "turnover" order should issue. Where he denies receiving, but the court finds that he did receive, we think that the result is legally the same as where he concedes possession. In each case there is ex hypothesi a finding of possession, in one based on an admission, in the other based on proof so compelling that the denial is of no avail. In each situation we think there is the same burden upon the trustee to prove possession at the time of the making of the "turnover" order. The result is determined either by evidence of possession at the time of the order or by the strength of the inference of continued possession, once possession is conceded or found to exist at the time of adjudication. The strength of the inference depends on the circumstances, which include the amount and nature of the property, the time which has elapsed, and the credibility of any explanation which the respondent may give. A distinction between the burden imposed on the trustee in cases where misappropriation by a respondent is admitted, and in cases where it is found to exist in spite of his denial, is a strong inducement to a fraudulent respondent to choose the former alternative. It is bound to become a favorite method of avoiding "turnover" orders in cases which do not differ essentially from those of unqualified denials of receiving except in the favorable result to the guilty party.

Judge Swan's opinion in Re Schoenberg, 2 Cir., 70 F.2d 321, illustrates what we have just said. There the bankrupt transferred his property to a family corporation which he formed and to which he conveyed his merchandise in exchange for its capital stock. For more than a year the corporation conducted the business with these assets. Its books were not called for by the trustee and "so far as appears, the proceeds received from disposal of the merchandise may have been used in business expenses and paying merchandise creditors." 70 F.2d page 323. The referee had there made no finding that the respondent corporation had goods or their proceeds at the date of the "turnover" order. There was thus neither evidence of continued possession of all the merchandise, nor facts allowing an inference that it was retained to the date of the "turnover" order. An order directing delivery of all the goods could not therefore stand. In the present case, Pinsky testified that he kept no books in his Harlem business and the referee found continued pos-

session down to the date of the "turnover" order.

█ In view of the large amount of property taken, the time which elapsed between the taking and the "turnover" order, the attempted futile explanation of its disposition and the evidence indicating that there was no dissipation after adjudication either in business ventures or for living expenses, we think the finding of the referee was right and the district court was justified in affirming his decision.

Order affirmed.

L. HAND, Circuit Judge (concurring).

I agree that on this record we should say that Pinsky had in his hands the money which he took: his testimony is that he used only $600 or $700, and for the rest lived upon his father-in-law; certainly we may take him at his word. That being true, I cannot see how our decision in Danish v. Sofranski, 2 Cir., 93 F.2d 424, is material here; any comment upon it is inevitably obiter. But since my brothers think it desirable to overrule it, I wish to dissent pro tanto. That case was very deliberately considered, and the doctrine was not laid down by chance; in our judgment we were only following In re Schoenberg, 2 Cir., 70 F.2d 321, the doctrine of which we believed, as I still believe, was right. I think so because the trustee should always prove how much of his loot the respondent has still in his control if he is to be compelled to disgorge. Everybody will, in form at least, agree so far; but an exception has grown up in cases where he denies that he ever had the money, and for this there is a good practical reason, since he cannot explain what he did with it, if he denies that he ever had it. Even so, as we said in Danish v. Sofranski, supra, there is a slip in the formal reasoning, because though we discredit the denial, we know that in fact the respondent has probably spent part of the money. That defect I am entirely willing to ignore, but I can see no excuse for extending it to cases where the respondent admits that he got the money but sets up a claim of right to it, as is the case here. This hiatus is said to be filled by a presumption and if there were ground for one I should agree. There is not; everybody knows that it is extravagantly improbable, at least when the theft is of money, that all of it remains unspent in the hands of such men. I agree that the respondent should be called upon to explain, but I deny that when he does not come forward to do so there is ground for presuming that he has kept all the money intact. That is so patently untrue that to base a presumption upon it violates my sense of due process of law. I would allow great latitude to a court in fixing the amount of the putative remainder, but I would compel it to be fixed.