323 F.2d 134
 In the Matter of PLYMOUTH DYEING CO., Inc., a corporation of the State of New Jersey, Bankrupt.
P.A.C. Realty Company, Alfred Gellene, Sr., Alfred Gellene, Jr., Charles Rosenberg and Alvin L. Rosenberg, Appellants.
 No. 14279.
 United States Court of Appeals Third Circuit.
 Argued June 6, 1963.
 Decided September 25, 1963.
 
 Samuel Kaufman, Newark, N. J. (Kaufman, Kaufman & Kaufman, John M. Kaufman, Andrew L. Kaufman, Newark, N. J., on the brief), for appellants P. A. C. Realty Co., and others.
 Jay R. Benenson, Newark, N. J. (Myron S. Lehman, Newark, N. J., on the brief), for appellee, David E. Feldman, Trustee in Bankruptcy.
 Before BIGGS, Chief Judge, and McLAUGHLIN and GANEY, Circuit Judges.
 McLAUGHLIN, Circuit Judge.
 
 
 1
 This is an appeal from an order of the district court affirming an order of the referee in bankruptcy. The referee's order, issued in summary proceedings, extended the bankruptcy proceedings of Plymouth Dyeing Co., Inc. (Plymouth) to include the assets of P.A.C. Realty Company (P.A.C.). P.A.C. and its officers have at all times asserted their status as a substantial adverse claimant and have strenuously objected to the exercise of summary jurisdiction by the bankruptcy court.
 
 
 2
 The sole matter raised in this appeal is a question of jurisdiction: whether the issue below was properly tried in summary proceedings or whether the trustee should seek his remedy by way of plenary suit. More precisely, the question is whether the referee exceeded his jurisdiction in the process of his preliminary inquiry as to the character (colorable or substantial) of P.A.C.'s claim. We believe that the exercise of summary jurisdiction was warranted by the facts in this case.
 
 
 3
 The applicable principles of law are not in dispute. "A bankruptcy court has the power to adjudicate summarily rights and claims to property which is in the actual or constructive possession of the court. * * * If the property is not in the court's possession and a third person asserts a bona fide claim adverse to the receiver or trustee in bankruptcy, he has the right to have the merits of his claim adjudicated `in suits of the ordinary character, with the rights and remedies incident thereto.' * * * But the mere assertion of an adverse claim does not oust a court of bankruptcy of its jurisdiction. * * * It has both the power and the duty to examine a claim adverse to the bankrupt estate to the extent of ascertaining whether the claim is ingenuous and substantial. * * * Once it is established that the claim is not colorable nor frivolous, the claimant has the right to have the merits of his claim passed on in a plenary suit and not summarily. Of such a claim the bankruptcy court cannot retain further jurisdiction unless the claimant consents to its adjudication in the bankruptcy court."[1] An adverse claim is said to be "substantial" "when the claimant's contention `discloses a contested matter of right, involving some fair doubt and reasonable room for controversy,' * * * in matters either of fact or law; and is not to be held merely colorable unless the preliminary inquiry shows that it is so unsubstantial and obviously insufficient, either in fact or law, as to be plainly without color of merit, and a mere pretense."[2] In applying the Harrison test to a particular set of facts "[t]he referee must proceed to determine whether the adverse claim is `plainly without color of merit and a mere pretense' on a proper weighing of the testimony considered in the light of the claimant's self-interest and a due consideration of existing law." (Emphasis supplied).[3]
 
 
 4
 The undisputed facts disclosed by the referee's preliminary inquiry may be briefly summarized.
 
 
 5
 In 1937 Plymouth Dye Works was formed by Paul Manton (50% interest), Alfred Gellene, Sr. (25%) and Charles Rosenberg (25%) to engage in the textile dyeing business. The corporation enjoyed substantial yearly profits until 1951 when it sustained a loss of $237,881. The following year appellant P.A.C. Realty was formed by Manton, Gellene and Rosenberg. The stockholders and officers of P.A.C. were identical with the stockholders and officers of Plymouth Dye Works. To this new corporation Plymouth Dye Works transferred its real estate, machinery and equipment and other minor items, with the exception of some office furniture and equipment. There is also testimony that P.A.C. additionally assumed and paid certain liabilities of Plymouth Dye Works amounting to $32,184. The net value of the transfer is placed at $705,140. In exchange therefor, Plymouth Dye Works received from P.A.C. all of its capital stock. This transfer of assets from Plymouth Dye Works to P.A.C. was carried out pursuant to the "spin off" provisions of the Internal Revenue Code.
 
 
 6
 Plymouth Dye Works then distributed all of the P.A.C. capital stock to its stockholders, Manton, Gellene and Rosenberg, who, as noted above, were also the stockholders of Plymouth Dye Works. Nothing was paid to Plymouth Dye Works for this distribution. The accountant for Plymouth Dye Works (and P.A.C.) testified that P.A.C. was formed at his suggestion in order to minimize Federal income taxes through utilization of the spin-off provisions of the Code. According to the testimony of Gellene, Sr. it was Manton's idea to form P.A.C. and he (Gellene) never asked why substantially all the fixed assets were to be transferred out of Plymouth Dye Works to P.A.C.
 
 
 7
 In any event, P.A.C. and Plymouth Dye Works thereafter entered into a written lease agreement on June 20, 1952 whereby P.A.C. leased the premises and machinery to Plymouth Dye Works for a term of one year. The lease, which was signed by Manton and attested to by Gellene, Sr. as president and secretary, respectively, of both corporations, called for an annual rental of $42,000 payable in monthly installments of $3,500. For the six months period of June 20, 1952 to December 31, 1952 Plymouth Dye Works paid P.A.C. $36,000, or an overpayment of $15,000. In that year Plymouth Dye Works had a profit of $12,801. During the calendar year 1953 Plymouth Dye Works paid P.A.C. $72,000 for rent, an overpayment of $30,000, and in the same year had a loss of $79,041. In the calendar year 1954 the rental of $42,000 called for in the original lease was paid by Plymouth Dye Works, while it sustained a loss of $105,785.
 
 
 8
 On February 17, 1955 a new corporation known as Hood Dye and Print Works, Inc. was organized with stockholders of record consisting of Charles Rosenberg's son Alvin (99 shares); Alfred Gellene, Jr. (50 shares); Leo Bohl (attorney for Plymouth Dye Works — 50 shares), and Louis Green (1 share). Its name was changed to Plymouth Dyeing Company, Inc. (hereinafter referred to as Hood-Plymouth) on March 10, 1955 and it commenced operation on April 13, 1955. The testimony indicates that the original 1937 corporation, Plymouth Dye Works, operated in January and part of February 1955 and then stopped doing business under that corporate name for the remainder of the year. Although the corporation, Plymouth Dye Works, did not continue business under that name after February 1955, the evidence revealed that there was a continuity of business function under the several corporate names throughout the year. Hood-Plymouth was dissolved on December 30, 1955 and Plymouth Dye Works was "reactivated" in order to take advantage of the loss carryback provisions of the Internal Revenue Code. Book entries were made transferring the assets and liabilities of Hood-Plymouth to Plymouth Dye Works and the latter then changed its name to Plymouth Dyeing Co., Inc. (Plymouth). Plymouth operated from January 1, 1956 until its present adjudication as bankrupt in April 1961.
 
 
 9
 In May 1955 a new written lease agreement was executed between P.A.C. and Plymouth, which provided for a six month term commencing April 15, 1955 with a rent of $18,000 plus 30% of the profit before taxes. In February of that year Gellene, Sr. and Charles Rosenberg had bought out Manton's interest in Plymouth Dye Works and P.A.C. for $76,000. Accordingly, the new P.A.C.-Plymouth lease was now signed by Gellene, Sr. and Rosenberg as president and secretary, respectively, of both corporations. In 1955 P.A.C. was paid $41,000 (or $41,200) as rent when only $38,000 was due under the applicable leases. Plymouth lost $81,640 in 1955. During the subsequent years Plymouth paid as rent $52,400 in 1956 (an excess payment of $16,400); $50,800 in 1957, $54,000 in 1958 and 1959, an excess of $18,000 in both years) and $45,351 in 1960 (excess of $9,351). In the corresponding years Plymouth sustained losses of $24,281 in 1956, $12,526 in 1958, $115,546 in 1959, $219,844 in 1960 and had a $59,356 profit in 1957.
 
 
 10
 Although there was no written lease in existence between P.A.C. and Plymouth after 1955, P.A.C. does not dispute the accuracy of the above figures. P.A.C. alleges that the basic rental sums were provided for by oral leases agreed upon by the principals (Gellene, Sr. and Rosenberg) of Plymouth and P.A.C. No explanation is given for the payments in excess of either the written or oral leases. Thus, from June 20, 1952 to December 31, 1960 P.A.C. received a rental of $109,900 in excess of the total amount called for by the applicable leases. During this same period of excess rental payments Plymouth sustained a total loss of $577,352.
 
 
 11
 The testimony further showed that in the fall of 1960 P.A.C. issued a distraint on the remaining fixed assets held by Plymouth (primarily office furniture and equipment) for nonpayment of the September rent. These assets, having a cost value of approximately $18,000, were sold to P.A.C., but remained at the same premises and continued to be utilized solely by the tenant Plymouth. At the time of the distraint Plymouth had a substantial bank account and subsequent to the sale it continued paying rent as before to P.A.C.
 
 
 12
 Against this background of the divestiture of tangible assets and the Plymouth-P.A.C. rental arrangements, additional undisputed facts appear. From 1952 to 1960 P.A.C.'s expenses of approximately $84,500 were attributable to taxes, insurance and repairs. The balance of the total rental payments — approximately $363,219 — was spent for the acquisition of new equipment and fixed assets to be used by Plymouth in its dyeing operation. These rental payments were the sole source of income for P.A.C. P.A.C. shared the office space with Plymouth and had no separate designated office space of its own; P.A.C.'s books were kept by Plymouth's bookkeeper, her salary was paid by Plymouth; and P.A.C. never declared any dividends and at most paid its officers a nominal salary. The uncontradicted testimony of Gellene, Sr., one of the principals in both Plymouth and P.A.C., is especially illuminating. When asked what the sole function of P.A.C. was he replied, "We had no function, we just had real estate and machinery." And later he agreed that the sole function of P.A.C. was to collect rent from Plymouth. Gellene, Sr. characterized Plymouth as the "operating" corporation and referred to P.A.C. as "a realty company", although he acknowledged that P.A.C. was not in the real estate business. He "couldn't answer" and "didn't know why" the rent fluctuated from year to year.
 
 
 13
 P.A.C. factored the accounts receivable of Plymouth, never factored for any other concerns and did not solicit anyone else's business for the purpose of factoring. On this point Gellene, Sr. testified as follows: "Q. Why did [P.A.C.] have to factor [Plymouth]? A. We factored for it to be in business, instead of borrowing from someone else we thought we would factor ourself * * * Q. Whom do you mean by `ourselves'? A. Well, Mr. Rosenberg and I. We advanced the [sic] P.A.C. and P.A.C. would advance it to the operating company."
 
 
 14
 A careful review of the transactions outlined above makes it clear that P.A.C. had no independent business existence and was organized for the sole purpose of serving and facilitating the business of Plymouth. The admission of Gellene, Sr., an officer and principal of P.A.C., that the corporation had no function other than to collect rent from Plymouth is especially persuasive. In essence, P.A.C. has nothing to support its claim to substantial adverse claimant status other than the existence of the corporate legal shell, separate federal income tax returns and separate insurance policies. Of course, the only source of P.A.C.'s income was the rental payments (and their excess) received from Plymouth. But "mere legal paraphernalia will not suffice to transform into a substantial adverse claimant a corporation whose affairs are so closely assimilated to the affairs of the dominant stockholder that in substance it is little more than his corporate pocket."[4] The facts adduced at the preliminary inquiry fully support the decision of the referee that there existed such an identity of interests between Plymouth and P.A.C. that P.A.C.'s claim could not be said to be substantial.
 
 
 15
 P.A.C. has continually placed great weight on the fact that at the time of the June 1952 spin-off Plymouth and P.A.C. were both solvent. It also stresses that every creditor of Plymouth and its nominal predecessors from 1952 to December 31, 1959 had been paid in full. While this is certainly relevant to the trustee's claim of fraud,[5] continued emphasis on this fact tends to obscure the primary point of concern here, namely, the relationship between P.A.C. and Plymouth throughout this period. These latter facts demonstrate "without fair doubt and reasonable room for controversy" both as to fact and law that P.A. C.'s claim is colorable and that P.A.C. is merely an agent and instrumentality of the bankrupt. In that situation, we must conclude that the referee properly determined that the claim of P.A.C. is merely colorable and that, accordingly, it has not been deprived of its right to plenary trial. We find further that the referee, having correctly decided he had jurisdiction on that ground to proceed summarily, was not in error in his ruling that the assets of P.A.C. were in the constructive possession of the bankruptcy court. And having justifiably found no need of taking further evidence on this latter question, the referee was wholly within his discretion in basing his ruling on the evidence adduced at the preliminary hearing.
 
 
 16
 The judgment of the district court will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 Cline v. Kaplan, 323 U.S. 97, 98-99, 65 S.Ct. 155, 156, 89 L.Ed. 97 (1944). See generally, 2 Collier, Bankruptcy par. 23.04, (2). — 23.07 — pp. 452-530
 
 
 [2]
 Harrison v. Chamberlin, 271 U.S. 191, 195, 46 S.Ct. 467, 469, 70 L.Ed. 897 (1926)
 
 
 [3]
 In re Meiselman, 105 F.2d 995, 998 (2 Cir. 1939); In re Gallis, 115 F.2d 626 (7 Cir. 1940), cert. denied Cotsirilos v. Klein, 312 U.S. 704, 61 S.Ct. 808, 85 L. Ed. 1137 (1941); Sahn v. Pagano, 302 F. 2d 629, 630 (2 Cir. 1962)
 
 
 [4]
 Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 218, 61 S.Ct. 904, 907, 85 L.Ed. 1293 (1941). In Sampsell there was also present an intent to defraud the creditors. However, it is clear that fraud does not have to be present in order to disregard the general rule of separate corporate identity. See, e. g., In re Watertown Paper Co., 169 F. 252, 256 (2 Cir. 1909); but see Maule Industries, Inc. v. Gerstel, 232 F.2d 294, 297 (5 Cir. 1956)
 
 
 [5]
 Trustee based his petition for extension of the bankruptcy proceedings over P.A.C. upon two independent grounds. He first presented the theory that the June 20, 1952 conveyance and transfer of all the real estate of Plymouth to P.A.C. was made with the intent to defraud the creditors of Plymouth by divesting Plymouth of all its physical assets. Further, he alleged that the transfer had the effect of causing Plymouth to become insolvent. Finally, the transfer of P.A.C.'s capital stock to Gellene, Sr. and Rosenberg was said to be without consideration and fraudulent
 Trustee's second approach for recovery of P.A.C.'s assets was on the theory that P.A.C. was nothing more than an agent and instrumentality of Plymouth and accordingly the assets of P.A.C. were in the constructive possession of the bankrupt.
 The referee's opinion states that the "trustee does not rely upon fraud" but rather upon his second theory that P.A.C. was the agent and alter ego of Plymouth. This is not quite accurate for the transcript of the hearings held before the referee reveals that trustee was proceeding at that time upon both theories alleged in his petition. Subsequently, in a letter memorandum to the referee after the close of the hearings trustee also states that he "has never abandoned his contention that fraud was actually intended and perpetrated in this matter * * *."
 Actually, the referee made an express finding that "both P.A.C. and Plymouth were solvent at the time of the `spin off', and no fraud on creditors was then created." This has the appearance of a finding on the merits, when — in light of the referee's determination on this issue — the merits of trustee's allegation should not have been reached.
 Since the sole function of the preliminary inquiry is to ascertain whether the adverse claim is real and substantial or merely colorable, once the referee concluded that P.A.C.'s denial of fraudulent intent, etc. was substantial he should have gone no further on that point as he was "without jurisdiction" regarding it. If that had been the only theory presented by the trustee, he would have been forced to seek his remedy in a plenary suit. That problem becomes moot in the light of our view that the holding of the referee regarding the trustee's "agency" petition is thoroughly sound.