In the Matter of CHANTLER BAKING COMPANY, Bankrupt.

UNITED STATES of America, Plaintiff,

v.

John E. REYNOLDS, Trustee of Estate of Chantler Baking Company, Bankrupt, Defendant.

Civ. A. No. 77-211.

United States District Court,
W. D. Pennsylvania.

July 18, 1977.

Marc E. Albert, Trial Atty., Tax Div., Dept. of Justice, Washington, D. C., Joel B. Strauss, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

William H. Markus, and Edmond B. Smith, Jr., Markus, Riethmuller & Smith, Pittsburgh, Pa., for trustee.

Lee C. McCandless, McCandless, Krizner & Kemper, Butler, Pa., for bankrupt.

## OPINION

JOHN L. MILLER, District Judge.

In this straight bankruptcy proceeding the United States seeks to review the Bankruptcy Court's order which denied its petition for payment of penalties and post-bankruptcy interest.[1] The appeal fosters this general question:

> May the United States collect penalties and post-petition interest from proceeds realized by the sale of the debtor's property which, while levied upon by the government prior to filing of the bankruptcy petition, was later surrendered, in accordance with a court-approved stipulation, to the Trustee for purposes of disposition?

To understand our approach to answering this question we deem it important to become familiar with the procedural background of the case.

## FACTS

From July 2, 1973 to January 22, 1974 the Internal Revenue Service assessed tax deficiencies against the bankrupt for federal income and social security withholding tax-

---

1. This appeal is authorized by Rule 801 of the Rules of Bankruptcy Procedure.

es. Formal demand for payment was made to no avail. The principal amount of the liens approximated $15,600.00. After IRS properly filed notices of tax liens for the previously assessed taxes, it levied upon certain real and personal property of Chantler Baking Company on March 13, 1974.[2]

Nearly three weeks later, April 2, 1974 to be exact, Chantler filed a voluntary petition in bankruptcy and this Court appointed John E. Reynolds Receiver in Bankruptcy. On April 15, 1974 the Receiver filed in this Court a pleading styled "Petition To Terminate Possession Of The Internal Revenue Service Of Assets Of The Bankrupt And To Place The Receiver In Possession". The thrust of this petition was that while the property levied upon by IRS was valued at $75,000.00, the amount of the government's claim was much less. Therefore, the Receiver averred—

> that it would be inequitable to permit the Internal Revenue Service to sell the property at a forced sale without an opportunity for your petitioner as Receiver to realize the equity which the bankrupt has in said real and personal property. (¶ 4.)

Accordingly, the Receiver prayed for an order directing the IRS to turn over possession of the seized property to him.

The United States, which responded the very same day, moved that the petition be denied for three reasons which can be summarized as follows:

1. The Court lacked summary jurisdiction to enter a turnover order because the property in dispute had been seized *prior* to institution of bankruptcy proceedings;

2. The Receiver's petition, being filed in the bankruptcy proceeding, was not a plenary suit; and

3. The United States did *not consent* to the Court's obtaining jurisdiction of the petition. (Emphasis added.)

It became unnecessary for the Court to decide the issues raised at that time, however, because on May 2, 1974, after oral argument on the petition, IRS and the Receiver entered into a Stipulation which provided in essence that IRS would relinquish possession of the real and personal assets of the bankrupt to the Receiver in exchange for the Receiver's promise to satisfy the tax liens from whatever proceeds were generated by a sale of the property. The Stipulation, which we approved by order on the same date, is silent on the matters of penalty and interest; however, its terms do provide for payment of the "tax liens" then being asserted by the government (¶s 2, 3, 6 and 7). The Stipulation further provided for a distribution schedule in that it obligated the Receiver to pay, with the exception of any secured creditors, the tax liens first and "prior to payment of all administrative expenses . . . ." (¶s 2, 3.)[3]

Thereafter the matter was referred to the Bankruptcy Judge. The Receiver became Trustee for the bankrupt and proceeded to fulfill the obligations attendant to administering the estate. The United States declined to file a proof of claim evidently wanting to preserve its unwillingness to assent to jurisdiction of the Bankruptcy Court.

The Trustee eventually sold the real estate for $75,000.00 and paid Union National Bank of Pittsburgh $10,932.27, the amount due on the mortgage. The United States was paid the sum of $16,593.83 on its tax claim. This amount represented the principal amount of the government's liens with interest to the date of bankruptcy.

The United States then filed in the Bankruptcy Court a "Petition For Payment To The United States Pursuant To Stipulation" seeking an additional amount of $3,755.56 plus interest to date of payment.[4] The

---

2. The levy was effected by padlocking the premises on which the bankrupt operated.

3. Expenses and fees incurred for sale of the real estate were, however, deductible from the proceeds. (¶s 4, 5.)

4. The amount of $3,755.56 represents lien fees, certain additions for failure to file returns and pay the taxes, and other penalties, all of which the taxpayer is liable for under the Internal Revenue Code. 26 U.S.C. §§ 6321, 6651(a)(1), 6651(a)(2), 6656(a).

government contended that it was entitled to the post-petition interest and penalties attaching to its tax liens *pursuant to the Stipulation.* The Bankruptcy Judge disagreed and disposition of that petition resulted in the order we review today.

In ruling against the government the court below reasoned that, while it normally would not have jurisdiction over debtor property seized prior to the date of bankruptcy, the Stipulation, which gave possession and control of the assets to the Receiver-Trustee, effected a transfer which necessarily made the property part of the bankrupt estate. Since the property was liquidated and the resultant proceeds were being distributed by the Trustee, the court perceived no difficulty in disallowing the additional amount under the Bankruptcy Act and case law. Because the court did not attach importance to the fact that the government filed no proof of claim, it apparently viewed the Stipulation as consent to its jurisdiction. The court also felt the Stipulation was contrary to law—and thus unenforceable—to whatever extent it might be interpreted to include penalties and post-petition interest.

### DISCUSSION

■ It is well settled that the Bankruptcy Act prohibits the allowance of penalties attaching to any claim being honored through administration of the bankrupt estate. Section 57(j), 11 U.S.C. § 93(j) (1970); *Simonson v. Granquist,* 369 U.S. 38, 82 S.Ct. 537, 7 L.Ed.2d 557 (1962). Also unquestioned is the legal maxim that post-petition interest does not attach to tax claims asserted against the assets of the bankrupt. *New York v. Saper,* 336 U.S. 328, 69 S.Ct. 554, 93 L.Ed. 710 (1949). Because the reasons behind these two propositions of law have been ably and many times discussed in the past the Court shall not render another explanation here. We find it sufficient for purposes of this proceeding to note that the Act is geared to conserve the estate so that the ultimate aim—equitable distribution of assets—can be achieved with maximum claim realization among the competing creditors.

### STIPULATION COVERS PENALTY AND INTEREST

■ Contrary to the Bankruptcy Court's view we are not troubled by the government's contention that the Stipulation, which obligates the Receiver-Trustee to pay the "tax liens", covers interest and penalties. That interpretation is supported by the Internal Revenue Code which makes clear that interest and penalties, *inter alia,* comprise part of the lien:

> If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (*including any interest,* additional amount, *addition to tax,* or assessable *penalty,* together with any costs that may accrue in addition thereto) *shall be a lien* in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person. 26 U.S.C. § 6321. (Emphasis added.)

Accordingly we hold that the Stipulation, if it is enforceable, provides for payment of the additional amounts being claimed by the United States.

### PROPERTY NOT PART OF BANKRUPT ESTATE

The key to this controversy is whether the Stipulation is enforceable. That determination depends on whether the property became part of the bankrupt estate when it was voluntarily turned over to the Receiver-Trustee. If it did then § 57(j), *Simonson v. Granquist* and *New York v. Saper, supra* are applicable to this case and the Bankruptcy Judge's order should be affirmed.

■ The Bankruptcy Judge's decision hinges on the fact that the government turned the property over to the Receiver-Trustee; thus, he automatically assumed that the property, because it was under the control of the Receiver-Trustee, became part of bankrupt's estate. This assumption was erroneous because it has been specifically held that property can be released to the trustee but not be considered part of

the bankrupt's estate; consequently, such property's disposition is not controlled by the Bankruptcy Act. *Pearlman v. Reliance Insurance Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962).

Section 2(a)(2) of the Bankruptcy Act only authorizes the Bankruptcy Court to allow or disallow claims made against the bankrupt estate. 11 U.S.C. § 11(a)(2) (1970); *see Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). The significant date on which title to the bankrupt's property passes to the trustee as part of the bankrupt's estate is the day the *petition is filed. Everett v. Judson,* 228 U.S. 474, 33 S.Ct. 568, 57 L.Ed. 927 (1913). Thus it has been held that post-petition interest is permissible when predicated upon a lien which attaches to non-estate property. *See e. g., Bruning v. United States,* 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964); *Hugh H. Eby Co. v. United States,* 456 F.2d 923 (3 Cir. 1972) (Chapter XI arrangement in which debtor property acquired after petition filed).

■ There is no question that, as of the date of bankruptcy, the United States had possession of the property in question. This Court then clearly had no summary jurisdiction to hear the receiver's turnover petition in April of 1974. *Cline v. Kaplan,* 323 U.S. 97, 65 S.Ct. 155, 89 L.Ed. 97 (1944); *In re Brokol Manufacturing Co.,* 221 F.2d 640 (3 Cir. 1955); *In re Rowand Co.,* 414 F.Supp. 1155 (E.D.Ark.1976); *see In re Plymouth Dyeing Co.,* 323 F.2d 134 (3 Cir. 1963). Had we been forced to so rule there is no telling what would have transpired regarding the disposition of that property. Fortunately, as the facts reveal, the parties opted for settling their differences amicably, a course of action this Court readily condoned. However, after reviewing the record, the Bankruptcy Act and relevant authorities we have come to the conclusion that this case does not turn on the question of summary jurisdiction. That issue as the Trustee contends is moot. The real question we think is whether the subject property became part of the bankrupt's estate when it was voluntarily surrendered to the Receiver-Trustee.

■ A factual analysis provides ample reason to conclude that the United States felt its claim would be paid without the normal administration of the bankrupt estate. It had prior constructive possession of the property. Under the law it did not have to relinquish this property pursuant to the Receiver's petition; therefore it was under no legal duress to enter into the Stipulation. The Stipulation itself provides further record evidence that except for the mortgage the tax claim was to be paid *before* any other claim and *prior* to deduction for expenses incurred during administration.[5] Moreover, the fact that the government filed no proof of claim pursuant to § 57, 11 U.S.C. § 93, indicates that satisfaction of the claim was founded on its contractual relationship with the Receiver-Trustee, not its status as a preferred lien-holder who would share in the liquidated assets during the course of administration. The facts clearly support the government's contention that this property did not become part of the bankrupt estate when turned over to the Trustee.

■ The Government's position is also secure from the legal standpoint. It is an undisputed fact that a valid levy was made pursuant to the Internal Revenue Code, 26 U.S.C. § 6331, prior to the bankrupt's voluntary petition. What makes the levy significant for our purposes is that it transferred more than possessory rights to the United States. While there has been a difference of opinion on this matter the Supreme Court in *Phelps v. United States,* 421 U.S. 330, 95 S.Ct. 1728, 44 L.Ed.2d 201 (1975), made crystal clear its unanimous view that a tax levy reposes *legal ownership* in the IRS of the property distrained. Mr. Justice Brennan, writing for the Court, observed at 336–37, 95 S.Ct. at 1732:

---

5. Normally, under § 64(a) of the Act, administration expenses are accorded first priority. 11 U.S.C. § 104(a) (1970).

Here we are concerned not with priority of tax liens but with the effect of a tax levy. Historically, service of notice has been sufficient to seize a debt, * * * and notice of levy and demand are equivalent to seizure. * * * The levy, therefore, gave the United States full legal right to the $38,000 levied upon as against the claim of the petitioner receiver. (Citations omitted.)

The Court removed any doubt about the question of what effect a levy has on ownership of seized property when it later stated that "the pre-bankruptcy levy displaced any title of [the bankrupt] Chicagoland . . . ." Id. at 337 n. 8, 95 S.Ct. at 1733.

That the language used by the High Court means exactly what it says has just this year been confirmed by the Ninth Circuit which read *Phelps* to hold that a tax levy operated to endow IRS with *all* rights in the seized property. *American Acceptance Corp. v. Glendora Better Builders, Inc.*, 550 F.2d 1220, 1222–23 (9 Cir. 1977). Moreover, the Third Circuit similarly recognized the effect of a tax levy—*i. e.*, as a transfer of ownership—more than a decade *before* the *Phelps* decision. In *United States v. Sullivan*, 333 F.2d 100, 116 (3 Cir. 1964) (*en banc*) Chief Judge Biggs, writing for a majority of the court, observed:

Levy is a summary, non-judicial process, a method of self-help authorized by statute which provides the Commissioner with a prompt and convenient method for satisfying delinquent tax claims. * * * Statutory levy is substantially broader in scope than anything known to the common law, and it is applicable to intangible as well as to tangible property. * * * When validly invoked, it effects a seizure of the delinquent's property tantamount to a *transferal of ownership*. (Emphasis added.) (Citations omitted).

It cannot therefore be questioned that at the time the petition in bankruptcy was filed *all* rights to the property at issue resided in IRS.

It is indeed arguable then that after this bankruptcy proceeding was initiated, the Receiver-Trustee's petition sought possession, not of the bankrupt's property, but of the government's property. Thus, in executing the Stipulation the government agreed to let the Receiver-Trustee sell its property and distribute the proceeds to Chantler's creditors *providing* the tax liens were first paid in full. This was a private arrangement and certainly one the government did not have to make to satisfy its lien.[6] The fact that the Trustee was given possession did not automatically convert the government's property to bankrupt property, thus making it part of the bankrupt's estate. It is axiomatic under bankruptcy law that the trustee can have no greater rights than that of the bankrupt. As Judge Hunter of the Third Circuit has noted:

Under Section 70(a) of the Bankruptcy Act, 11 U.S.C. § 110(a), the trustee in bankruptcy is "vested by operation of law with the title of the bankrupt" to various kinds of property. *Bank of Marin v. England*, 385 U.S. 99, [87 S.Ct. 274, 17 L.Ed.2d 197], * * * But the Bankruptcy Act, insofar as it is relevant here, does not vest the trustee with greater title than that which the bankrupt possessed.

*In re Universal Medical Services, Inc.*, 460 F.2d 524, 525–26 (3 Cir. 1972). (Citations omitted.) (Footnote omitted.) *See also Everett v. Judson*, 228 U.S. 474, 33 S.Ct. 568, 57 L.Ed. 927 (1913).

We entertain no doubt that had the government pressed its position in 1974 the Receiver (and the creditors) may well have been seriously disadvantaged. Also, the IRS was facing uncertainty in that, not having attempted to sell the property, it was speculating on whether a self-induced sell could bring in the full amount of its claim. Thus, a compromise was advantageous to both in that by utilizing the Receiver's expertise, the government was vir-

---

**6.** In view of the fact that the property had a market value of $75,000.00 it does not seem unreasonable to infer that IRS could have sold the property itself for approximately one-fifth (¹/₅) of that amount. Of course, there was still no guarantee that it could sell the property for that amount.

tually assured of full satisfaction while the Receiver, knowing that the tax claim amounted to approximately twenty percent (20%) of the property's market value, realized that there would remain a substantial excess—even with the mortgage payoff—for distribution and expenses. This remaining amount of course would pass to the estate upon the government's interest being divested.

While the *Phelps* decision provides substantial support for the government's position we prefer to place further reliance for our decision on two Supreme Court cases which, while not squarely on point, share certain similarities with the case at bar.

The government's case is predicated on the Stipulation. The Supreme Court many years ago held that a trustee is bound by the terms of an agreement which results in the surrender of property held by an adverse claimant. In *Bryant v. Swofford Bros. Dry Goods Co.*, 214 U.S. 279, 29 S.Ct. 614, 53 L.Ed. 997 (1909) the bankrupt had been delivered certain merchandise from a dry goods company for resale. The contract provided that title to the merchandise or its proceeds, once sold, would remain in the dry goods company. When the bankrupt became insolvent the unsold goods and the proceeds from those sold—in the form of notes and accounts—were returned to the company. The receiver, Bryant, demanded possession of all the property (goods and proceeds) but was refused. The Company and the receiver then agreed, with the referee's approval, to the following: The dry goods company agreed 1) to surrender the goods, notes and accounts to the receiver and 2) that the receiver could dispose of this property as assets of the estate. The receiver agreed 1) that the goods, accounts and notes were in the adverse possession of the company, 2) that the goods were part of those delivered to the bankrupt under that contract, and 3) that the notes and accounts *represented proceeds of other merchandise delivered under the contract.* *Id.* at 290, 29 S.Ct. 614.

The receiver-trustee then sold the goods and collected on some of the notes and accounts but later refused to return the property to the company. This was because it had been determined that not all of the property belonged to the company in the first instance.

The Supreme Court in ruling against the receiver-trustee made two significant decisions pertinent to the case at bar. First it held that the trustee was bound by the terms of the private agreement made with the claimant. Also, and notwithstanding the fact that some of the property was not in the rightful possession of the dry goods company, the Court held that *pre-bankruptcy possession* was the controlling fact in determining the competing rights to the property:

When the receiver made his demand for [the property] the return was at first refused. The parties in the controversy, then being at arm's length, agreed that if the Dry Goods Company would give up the advantages of possession and instead of converting the goods, notes and accounts into cash in its own way and on its own account, permit the receiver to do so, then those *goods should be deemed part of those delivered under the contract and the notes and accounts the proceeds of other goods delivered under the contract.* This arrangement was approved by the referee. The trustee has taken the property under it and has never offered to return the property, or any part of it. The property has in large part been sold or otherwise disposed of in the course of the bankruptcy administration. Under these circumstances we are of opinion that the trustee * * * was *bound by the agreement of the receiver*, that all the property in dispute should be conclusively deemed that which passed under the original conditional contract or the proceeds thereof.

*Bryant v. Swofford Bros., supra* at 291–92, 29 S.Ct. at 618. (Emphasis added.) Thus the Court's ruling in effect permitted some of the property which should have, after liquidation, been distributed to other creditors, to be distributed to the wrongful but *prior* possessor. The fact that the Court so

ruled in spite of the *equitable* nature of a bankruptcy administration, only serves to highlight the importance of the claimant's possession *prior* to bankruptcy. The case before us of course is not nearly as inequitable since *all* of the property in the government's *rightful* possession was turned over to the Receiver in return for full satisfaction.

The second Supreme Court decision, which we believe is factually closer to the case at bar, was decided forty years later. In *Goggin v. Division of Labor Law Enforcement of Calif.*, 336 U.S. 118, 69 S.Ct. 469, 93 L.Ed. 543 (1949), the Collector of Internal Revenue seized the debtor corporation's personal property pursuant to a tax lien. Thereafter the corporation filed a voluntary petition in bankruptcy and was adjudicated a bankrupt the same day. After the Collector unsuccessfully attempted to sell the assets he decided to relinquish possession to the receiver-trustee. The turnover agreement, which was less specific than the subject Stipulation, provided in pertinent part:

> Government's lien to attach to proceeds from sale subject to Trustee's expenses including costs of sale. *Goggin, supra* at 122, 69 S.Ct. at 471.

The receiver-trustee then proceeded to liquidate all the assets under his control, a course of action which resulted in the realization of approximately $31,000.00 for the estate. The referee certified this amount to be insufficient for full payment because, in addition to the expenses of administration, the federal tax claim *with penalties and interest* exceeded $78,000.00. Also, there were wage claims approximating $3,400.00 and a state tax claim for $15,-135.00.

With regard to distribution the referee ruled that the administration expenses were to be paid first with the balance going to the government. The district court adopted that decision and entered judgment accordingly. The Ninth Circuit reversed holding that, because the Collector relinquished possession to the property, the tax claim must be postponed for the wage claims. *See* 165 F.2d 155. The appellate court reasoned that, since § 67(c) of the Bankruptcy Act provided for postponement of tax claims when the government was not in possession of the liened property, the wage claims were entitled to priority under § 64 because the Collector had relinquished possession to the receiver-trustee.

On appeal the United States Supreme Court considered the question of whether "possession" as used in § 67(c) spoke as of the time the *petition was filed.* Answering that question affirmatively the Court reversed holding "that the lien was valid and entitled to priority of payment as against the wage claims at the *date of bankruptcy* and that the Collector's relinquishment of possession of the bankrupt's property did *not* change the result." *Goggins, supra* 336 U.S. at 121, 69 S.Ct. at 470. (Emphasis added.)

Not only did the High Court reaffirm the teaching of *Everett v. Judson, supra*—*i. e.*, that the bankrupt estate is defined at the time the *petition is filed*—it recognized that a perfected lienholder enjoys a superior position [7] to that of other valid claimants and should *not* be penalized for desiring to have the receiver-trustee liquidate the property. The Court went on:

> The arrangement between the Collector and the trustee was a natural and proper one. While the amended claim for taxes, *penalties and interest* * * * amounted to $78,865.03, the original claim, filed with notices of lien prior to [the date of bankruptcy] amounted to only $40,921.94 (even *including the interest and costs* later computed to August 21, 1946). Of this sum the taxes themselves amounted only to $34,848.04. To meet this, the trustee * * * had on hand $31,206.20, evidently derived from the sale of the property originally held by the Collector. These figures, accordingly, suggest the possibility that, [at the time of bankruptcy], it reasonably may have

---

7. No court questions the fact that a seizure of assets prior to bankruptcy puts that creditor in a superior position; *see e. g., In re Cherry Valley Homes, Inc.*, 255 F.2d 706 (3 Cir. 1958).

been supposed that a *surplus* above \* \* \* the Government's tax claim might be realized from the sale . . .. In that event, it would have been the *obviously appropriate procedure* for the trustee to sell the property free and clear of liens and encumbrances and then distribute the proceeds to the rightful claimants. *Goggin, supra* at 130, 69 S.Ct. at 475. (Emphasis added.)

Thus, the Court not only accorded the government priority by virtue of its pre-bankruptcy seizure, it did so under circumstances where there was *no excess* in which the wage claimants could share. In the case at bar the Receiver-Trustee cannot even advance an argument premised on equitable considerations because, unlike *Goggin,* paying the IRS claim *sub judice* in full will *not* exhaust the funds.

Moreover, if we were to rule in the Trustee's favor, the government might henceforth refuse—*maybe* to its detriment but *certainly* to the other creditors' detriment—to surrender possession of debtor property in cases where excess proceeds are probable. As the Court observed in *Goggin, supra* at 131, 69 S.Ct. at 476:

> The propriety of the present conclusion is emphasized by the fact that the opposite conclusion would, in many other cases, operate to the detriment both of unsecured creditors and of the statutory lien holders. It would compel a lien holder to retain his actual possession of the property in order to be sure of his full priority in the payment of his tax claim. He would be compelled to do this, even though by doing so the bankrupt's property probably would yield a smaller sales price than if sold by the trustee.

It is clear from *Goggin* that the mere surrender of property by the government will not operate to make that property part of the bankrupt estate and, therefore, disposable in accordance with §§ 64 and 67. Also, it is significant to note that the Court never questioned the interest and penalty part of the tax claim which more than doubled the principal amount of the tax owed. This is particularly noteworthy considering the fact that the Court decided *New York v. Saper, supra* during the same term.

For the above reasons the Court concludes that the property did not become part of the bankrupt's estate when it was surrendered to the Receiver-Trustee. Accordingly, that property's disposition, as far as the government is concerned, is not controlled by the Bankruptcy Act. *Pearlman v. Reliance Insurance Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). The Bankruptcy Court's order must therefore be reversed.

An appropriate order shall issue.